OBRECHT v. NATIONAL GYPSUM COMPANY.

SAME v. DIRECTOR OF CONSERVATION.

1. NAVIGABLE WATERS—BEDS OF GREAT LAKES.
    The Supreme Court, equally with the legislative and executive
        departments, is one of the sworn guardians of the State's
        duty and responsibility as trustee of the portion of the beds
        of the Great Lakes within the State's boundaries.

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 2, 5] 56 Am Jur, Waters § 52.
[3, 4] 56 Am Jur, Wharves § 33.
[6] 56 Am Jur, Waters § 197.
[7] 56 Am Jur, Waters §§ 216, 217.
[8] 56 Am Jur, Waters § 450.
[9] 56 Am Jur, Waters § 471.
[10] 56 Am Jur, Wharves. § 5.
[11] 39 Am Jur, Nuisances § 44.
[12–14] 39 Am Jur, Nuisances § 5, § 53 et seq.; 56 Am Jur, Waters
    § 405 et seq.; 56 Am Jur, Wharves § 11.

2. SAME—GREAT LAKES—SUBMERGED LANDS—ALIENATION.

No part of the beds of the Great Lakes belonging to the State can be alienated or otherwise devoted to private use except as there be a due finding that a given parcel of submerged land be conveyed in the improvement of the interest thus held or that the disposition may be made without detriment to the public interests in the lands remaining.

3. SAME—GREAT LAKES—SUBMERGED LANDS—RIPARIAN OWNERS— WHARFAGE.

The public title and right to submerged lands forming the part of the beds of the Great Lakes within the State's boundaries is supreme against a riparian owner's right of wharfage.

4. SAME—GREAT LAKES—RIPARIAN OWNERS—WHARFAGE—CONSENT.

A riparian owner along the shore of the Great Lakes may exercise the right of wharfage only with the regulatory assent of the State.

5. SAME—GREAT LAKES—RIPARIAN OWNER—WHARF.

A riparian owner who entered upon the bed of the waters of the Great Lakes and built a wharf following an erroneous decree of a circuit court in that no assent had been given by the State effected an entry upon and unlawful detention of State property.

6. SAME—STATES—RIPARIAN OWNERS.

A State has constitutional power to insist that its natural advantages shall remain unimpaired and, as against a riparian owner along a navigable body of water, retain what it has and give no one a reason for its will.

7. SAME—RIPARIAN OWNER—WHARF—PROTECTION OF THE PUBLIC.

A riparian proprietor is entitled to access to the navigable part of the water on the front of which lies his land, and for that purpose to make a landing, wharf, or pier for his own use or for the use of the public, subject to such general rules and regulations as the legislature may prescribe for the protection of the rights of the public.

8. SAME—STATES.

Public property, such as lands under navigable waters, cannot be placed entirely beyond the direction and control of the State.

9. SAME—PUBLIC POLICY.

The public policy of this State with respect to submerged lands under navigable waters is that they may be disposed of only when the department of conservation determines that such

lands have no substantial public value for hunting, fishing, swimming, pleasure boating, or navigation and that the general public interest will not be impaired by such disposition (CLS 1956, § 322.702, as amended by PA 1958, No 94).

10. SAME—GREAT LAKES—RIPARIAN OWNERS—WHARF—STATES.
A riparian owner of land along the shores of the Great Lakes may not wharf out to deep water navigable by large ocean-going boats except in compliance with State regulatory measures.

11. NUISANCE—CONSIDERATION OF LOCALITY AND SURROUNDINGS.
The locality and surroundings of the challenged operation or thing become an important factor in arriving at proper judicial decision of existence or nonexistence of an actionable nuisance.

12. SAME—WHARF TO NAVIGABLE WATER—DAMAGES.
The construction of a wharf upwards of 1,000 feet long and dredging of channel out to deep navigable water for use by large boats carrying gypsum rock, an otherwise lawful industrial operation, pursuant to provisional permit by department of conservation, near the center of an area devoted to summer cottage use and now beyond judicial abatement, subjected the defendant to payment of such damages as plaintiffs may be able to prove.

13. SAME—DAMAGES—WHARF TO NAVIGABLE WATER—SUMMER COTTAGE OWNERS—PURPRESTURE.
Noise, dust, smoke, pollution of air and water as result of defendant's construction of wharf from its shore front upwards of 1,000 feet long and dredging of channel out to deep navigable water are items of damage to nearby summer cottage owners unable now to abate the nuisance created by defendant's purpresture.

14. NAVIGABLE WATERS—GREAT LAKES—WHARF—SUMMER COTTAGES—EQUITY.
Wharf which was constructed out to deep navigable water in the midst of an area devoted to private summer cottage use along shore of Great Lakes is not now ordered removed, but operable subject to the will of the State and such decretal provisions for control of its use as equity may decide, on new testimony, to impose.

Appeals from Iosco; Dehnke (Herman), J. Submitted April 5, 1960. (Docket Nos. 1, 2, Calendar Nos. 47,917, 47,984.) Decided September 16, 1960.

Bill by Malvern F. Obrecht, Arthur L. Johnson, Rev. Fr. Robert Neuman, and others against National Gypsum Company, a Delaware corporation, to enjoin as public and private nuisance the construction of a loading dock and the dredging of lake bottom to make a turning basin and a channel to navigable water. The State of Michigan intervened as party plaintiff.

Bill by Malvern F. Obrecht, Rev. Fr. Robert Neuman, and others against Gerald E. Eddy, Director of Michigan Department of Conservation, and the Michigan Department of Conservation to enjoin proposed sale of submerged lands to National Gypsum Company, which corporation intervened as party defendant.

Decrees entered denying relief prayed, imposing certain provisions for construction and operation of loading dock, and retaining jurisdiction for purpose of abating any future nuisance. Plaintiffs appeal. State of Michigan appeals as intervening plaintiff and Michigan Department of Conservation and its director cross-appeal as defendants. Cases heard together on appeal.

Reversed, with no injunctive abatement of facilities, construction of which were completed pending appeal, but with order that continued existence be provisional upon the will of the State. Remanded for further decretal provisions as to control of operations and for determination of and award of damages to neighboring property owners.

*Smith & Brooker,* for plaintiffs.

*Paul L. Adams,* Attorney General, *Samuel J. Torina,* Solicitor General, and *Nicholas V. Olds,* Assistant Attorney General, for intervening plaintiff State of Michigan, and for cross-appealing defendants Michigan Department of Conservation and its director.

*John R. Watkins (Finck & Huber, Elmer E. Fink* and *William L. Rieth,* of counsel),. for defendant.

*Amici Curiae:*

*Goetz & Goetz & Foley (Thomas.J. Foley,* of counsel), for intervenors Dunbar & Sullivan Dredging Co., and The River & Harbor Improvement Association.

*Victor G. Hanson,* for intervenor The Maritime Trades Department of the AFL-CIO.

. BLACK, J.   The last great frontiers of Michigan's public domain lie submerged between her thousands of miles of shore line and the navigable boundaries which, historically, have separated and now separate Michigan from Indiana, Illinois, Wisconsin, Ontario and Ohio.*   Now that the St. Lawrence Seaway is making of the Great Lakes an "Eighth Sea," the courts of these inland coastal States may well brace themselves for a series of new questions having to do with the nature and alienability of sovereign title to such domain and the inevitable collision of riparian rights—claimed by the common law—with the sovereign responsibility as permanent trustee thereof.   These cases become a notable forerunner.

---

* For definition of such boundaries, see the first article of Michigan's Constitution (1908).

National Gypsum Company, defendant in No. 47,917 and intervener in No. 47,984, is engaged in Iosco county in the business of mining and transporting gypsum rock. Its mining operations are carried on several miles inland from Saginaw bay, which is one of the great if comparatively shallow arms of Lake Huron. Until recently transportation · of such product, from the company's quarries to processing plants, was accomplished exclusively by rail. Now, .by completed marine installations and operations the threat of which gave rise to this litigation, a substantial part of its product is transported to such processing plants by modern lake steamers. These steamers, unlike the lighter vessels of an earlier day, draw 20 to 22 feet of water when loaded.. Thus a riparian's common-law right of wharfage "to the channel" becomes affected, as in the present cases, by a new fact.

In 1956 National Gypsum acquired title to 600 feet of property fronting east on Tawas bay, one of the shallower reaches of Saginaw bay, with a view toward transporting its mined product to marine facilities for Great Lakes shipment. The company's original plan, submitted in its first application to the United States corps of engineers, was that of constructing over the water a long aerial tramway of steel, supported by steel and concrete piers or bents water-spaced 200 feet apart. The tramway as planned was to extend from the shore line 6,000 feet east, into and over the bay, to an elevated "loading tower." It was designed to carry a belt conveyor system leading from the company's rail and rock storage facilities (on the west side of highway US–23) to such "loading tower," from which steamers were to be loaded by means of a transverse shuttle belt conveyor. The plan, incidentally, called for a minimal clearance of the aerial structure, above water, of 30 feet.

Such plan, having received due approval of the corps of engineers, was abandoned by the company because "it was out of the realm of economics from a capital installation cost." Another application to the corps of engineers was thereupon made and granted. Such grant gave assent so far as the Federal government is concerned to the construction of a massive and permanent loading dock, extending some 1,076 feet easterly into the bay from the shore of the company's property, and the dredging of more than a mile of deep channel leading westward from the deeper waters of the bay to and on both sides of such dock. The dock was constructed, and the dredging operations were completed, after the chancellor's decision was given below in favor of National Gypsum. A part of the dredging was apparently done before entry of decrees. The dock and channel are now in steady use for marine-transportational purposes.

The installation, of which plaintiffs bitterly complain, carries a similarly designed belt conveyor system which extends under the highway from the mentioned rail and storage facilities to such loading dock. Passage by boat along the shore is restricted to the always fluctuating distance between the water's edge and the first of 7 great piers or cells supporting the superstructure of the dock. The present overhead clearance beneath the conveyor gallery (the gallery extends from a concrete crib near the shore to the first of such piers) for such passage is 12 feet and 6 inches.

In furtherance of its altered plans the company sought legislation authorizing sale to it, by the department of conservation, of certain of the submerged land lying opposite its mentioned shore property. See PA 1957, No 176. The enacted bill,

quoted as to section 1 in the margin,[1] provides for quit-claim conveyance to the company by the State of a submerged parcel which extends—800 feet eastward from the shore—the north and south boundaries of the company's shore property.[2] However, the loading dock as actually constructed extends into the water 276 feet more than the 800-foot distance fixed by the description set forth in the act. This fact, which is not disputed, points up the principal question with which the Court is faced in both cases. Such question may be stated this way: May a riparian proprietor of Michigan Great Lakes frontage, having obtained due permit from the United States corps of engineers,[3] of right and regardless of leave

---

[1] "Sec. 1. The department of conservation of the State of Michigan is hereby authorized and directed to convey to the National Gypsum Company, upon receipt of the consideration of $4,000 or the amount of the value of said lands as determined by the appraisal of the State tax commission which is hereby authorized and directed to make such appraisal, whichever is the greater, all the right, title and interest of the State of Michigan, except all oil and gas contained therein, in the unpatented overflowed and lake bottom lands of Tawas bay, Lake Huron, belonging to the State of Michigan or held in trust by it, lying easterly of fractional section 2, township 21 north, range 7 east, in Iosco county, Michigan, and lying within an area described as follows:" (here follows a proper description of the 600 by 800-foot submerged parcel which lies opposite the National Gypsum frontage).

[2] On account of a temporary injunction obtained against the State department of conservation, no conveyance in pursuance of this Act has been executed. National Gypsum is not pressing the department, at present, for such conveyance. It relies on the asserted right of riparian wharfage.

[3] The reader will understand that permission given by the corps of engineers to dredge and construct has no effect upon the separate right and duty of the riparial State to protect and conserve the submerged lands of which it is public trustee. Here the preamble of the permit, issued to National Gypsum by the corps of engineers, refers directly to *Cummings* v. *Chicago*, 188 US 410 (23 S Ct 472, 47 L ed 525), and recites as follows:

"It is to be understood that this instrument does not give any property rights either in real estate or material, or any exclusive privileges; and that it does not authorize any injury to private property or invasion of private rights, or any infringement of Federal, State, or local laws or regulations, nor does it obviate the necessity of obtaining State assent to the work authorized. It Merely Expresses the Assent of the Federal Government so far as Concerns the Public Rights of Navigation."

of the State construct a permanent dock or wharf extending with or without accessory dredging into the waters of the lake a sufficient distance—whatever that distance may be—to reach lake steamer draft depths? The company asserts such right in these cases, regardless of effect of or want of conveyance under said Act No 176, and so justifies its dredging operations as well as construction and utilization of the loading dock. The plaintiffs and the attorney general categorically deny such right. In addition the plaintiffs, all being nearby riparian cottagers and home owners, insist that the dock and the company's use thereof, for the purposes of its design, now constitute and will constitute an actionable and abatable nuisance.

For alleged want of a clearly defined legislative policy the primary question seems to have been one of considerable difficulty when these cases were heard by the chancellor. Before signature of decrees (July 21, 1958), however, the legal situation had changed to one of definite certainty. Following enactment of the submerged lands act of 1953 (67 Stat 29, 43 USC [1958 ed], §§ 1301–1315), by which the United States relinquished to the coastal States its remaining rights, if any, in all lands lying beneath navigable waters within State boundaries (for recent resume of such act and its purposes see *United States* v. *Louisiana,* 363 US 1 [80 S Ct 961, 4 L ed 2d 1025], and *United States* v. *Florida,* 363 US 121 [80 S Ct 961, 1026, 4 L ed 2d 1096]), the legislature of Michi-

---

The opinion of *Cummings* concludes (p 431) as follows:

"The effect of that act, reasonably interpreted, is to make the erection of a structure in a navigable river, within the limits of a State, depend upon the concurrent or joint assent of both the National Government and the State government. The secretary of war, acting under the authority conferred by congress, may assent to the erection by private parties of such a structure. Without such assent the structure cannot be erected by them. But under existing legislation they must, before proceeding under such an authority, obtain also the assent of the State acting by its constituted agencies."

gan passed the Great Lakes submerged lands act of 1955 (CLS 1956, § 322.701 *et seq.*, Stat Ann 1958 Rev § 13.700 [1] *et seq.*). The act of 1955, as amended by PA 1958, No 94 (Stat Ann 1959 Cum Supp §§ 13-.700[2]–13.700[6], 13.700[10]), authorized the department of conservation to convey or lease, subject to specific limitations provided therein, "the unpatented lake bottom lands and unpatented made lands in the Great Lakes, including the bays and harbors thereof, belonging to the State of Michigan or held in trust by it." By the amendment of 1958, the legislature added a new section 10, providing as follows:

"Sec. 10. Any person who excavates or fills, or in any manner alters or modifies any of the land subject to the provisions of this act without the approval of the department shall be guilty of a misdemeanor, and upon conviction shall be fined not more than $1,000 or imprisoned not more than 1 year, or both such fine and imprisonment. Lands, the use of which are so changed, shall not be sold to any person convicted under this section at less than fair cash market value."

The chancellor's opinion, on strength of which the appealed decrees in these cases were entered, was filed April 8, 1958. The amendatory act (No 94 aforesaid) was passed 6 days later. The legislature ordered that it become effective July 1, 1958. July 16, 1958, Dunbar & Sullivan Dredging Company, having theretofore contracted with National Gypsum to dredge the desired deep water channel, filed with the department of conservation an application for approval of such dredging operations. July 30, 1958, National Gypsum filed with the department its separate application for such approval, and also for approval of its then-under-construction dock and marine conveyor facilities. The latter application,

having made due reference to said section 10, concludes as follows:

"Your petitioner prays that the department of conservation grant to your petitioner, its servants, agents, and employees the approval of the department permitting the completion of the dredging described as shown in the application for a permit from the United States corps of engineers attached hereto and the completion of the construction of the shiploading facility as described therein, all in accordance with the permit granted by the United States corps of engineers.

"The foregoing petition is made (1) without prejudice to any of its rights in law or in equity, (2) without in any way acknowledging the validity of PA 1958, No 94, (3) without admitting that the activities of the petitioner herein, its agents and servants, in any way violate the provisions or are subject to the provisions of the act, and (4) without in any way waiving, forfeiting or making any election with respect to any of its rights in any statutes of the State of Michigan or at common law as a riparian owner of land adjacent to the shores of Lake Huron or its right to contest the constitutionality of said act and statutes."

The department ordered a public hearing of both applications, which hearing was conducted at Lansing July 30, 1958. The "Statement of Proceedings" of such hearing, submitted to us by supplemental appendix, shows that the present litigation was thoroughly reviewed, and that the director (of the department of conservation) did on the occasion make careful effort to compose the differences of the contending parties, including the State, without prejudice to their respective legal rights. At conclusion of such hearing the department authorized issuance of a provisional permit to National Gypsum for completion of the dredging and construction projects, reciting in the permit a long series of "no

prejudice" stipulations. The permit was dated August 12, 1958. It authorized the company to proceed at legal risk and concluded with these paragraphs:

"That should the legislature of the State of Michigan by law require any change, modification or alteration of said facilities, or should require the securing of different or additional permits for the continuing use and operation of said facilities, the National Gypsum Company or its successors and assigns shall forthwith comply with the requirement of said law or laws and upon its failure so to do, this permit shall be null and void.

"All of the above provisions to be incorporated in said permit shall be without prejudice to the rights of all parties involved to pursue their remedies through the courts."

Thereupon the company proceeded immediately to dredge, construct, and operate according to its second plan. Plaintiffs and the attorney general have meanwhile prosecuted these appeals.

The first of these suits (in point of time but not in the order of present entitlement) was filed by the plaintiff cottagers and home owners against the director and the department of conservation to obtain a decree declaring that the quoted act of 1957 is invalid and unconstitutional. A preliminary hearing was held July 15, 1957, as a result of which the chancellor authorized a temporary injunction. The effect of such injunction was to restrain dredging or construction by National Gypsum. At the same time National Gypsum was authorized to intervene as a defendant. This first suit was not brought to hearing or determination until the second suit, now to be outlined, was heard and decided.

The second suit was instituted December 23, 1957, by substantially the same parties plaintiff against National Gypsum Company as defendant. In the meantime the company had changed its construction

plans, as noted above. This second bill alleges that the threatened dock construction and auxiliary dredging operations would, unless stopped, constitute a public as well as private nuisance. Allegation was made that the action of the waves and shore currents would, the dock being constructed, slowly starve the beach front of sand on one side of the dock and build an excessive and abnormal beach of sand on the other; that the close-to-shore loading of steamers would pollute the water and the air of the same area with dust, oil and other objectionable matter and, in general, that the whole operation would destroy or impair the value and enjoyment of plaintiffs' nearby property and affect adversely the healthful and recreational advantages of the lake front for a considerable distance each way.

The attorney general intervened in this second suit. He contended and now contends that the department of conservation has no right to convey, according to the act of 1957, for want of formal (legislative or departmental) determination that conveyance to private use of the submerged lands described in the act "would cause no injury to the public trust." He insists further that the company has illegally appropriated to its own use more than a mile of submerged State land extending into the bay and that the dock as constructed, if not presently abatable according to the view of equity, should be allowed to remain "without right and only at the sufference of the State."

### First: The Riparian Right Considered Against the Public Right.

The greatest burden of an appellate court—usually—is that of searching, sifting, and stating the facts of reviewable moment. With the facts assembled and known for what they are, the legal jugular of

the case invariably becomes exposed for definitive and precedential treatment.[4] It is so here. More words are required for presentation of the determinative facts than for pronouncement of the law to be applied.

This Court, equally with the legislative and executive departments, is one of the sworn guardians of Michigan's duty and responsibility as trustee of the above delineated beds of 5 Great Lakes. Long ago we committed ourselves (see *State* v. *Lake St. Clair Fishing & Shooting Club,* 127 Mich 580, 594, 595; *State* v. *Venice of America Land Co.,* 160 Mich 680, 702; *Nedtweg* v. *Wallace,* 237 Mich 14, 21, 24, 34) to the universally accepted rules of such trusteeship as announced by the supreme court in *Illinois Central R. Co.* v. *Illinois,* 146 US 387 (13 S Ct 110, 36 L ed 1018). That exhaustively reasoned decision may be read with profit as Michigan approaches, again as in white pine days, the impending construction and utilization, as instruments of maritime commerce, of more deep water docks and piers along her lakebound shores. Turning to pages 453 through 460 of the report, and reading those pages in conjunction with our quoted act of 1955 as amended in 1958, it will be found authoritatively that no part of the beds of the Great Lakes, belonging to Michigan and not coming within the purview of previous legislation such as the swamp land acts and the St. Clair Flats leasing acts (see *State* v. *Lake St. Clair Fishing & Shooting Club* and *Nedtweg* v. *Wallace, supra*), can be alienated or otherwise devoted to private use in the absence of due finding of 1 of 2 exceptional

[4] Repeated here (from *Ruediger* v. *Klink,* 346 Mich 357, 371) are these postulates of Mr. Justice Cardozo:

"More and more, we lawyers are awaking to a perception of the truth that what divides and distracts us in the solution of a legal problem is not so much uncertainty about the law as uncertainty about the facts—the facts which generate the law. Let the facts be known as they are, and the law will sprout from the seed and turn its branches toward the light."

reasons for such alienation or devotion to nonpublic use. One exception exists where the State has, in due recorded form, determined that a given parcel of such submerged land may and should be conveyed "in the improvement of the interest thus held" (referring to the public trust). The other is present where the State has, in similar form, determined that such disposition may be made "without detriment to the public interests in the lands and waters remaining." Instances where the legislature has directly and specially pursued its exceptional and conceded authority in such regard may be found on examination of PA 1954, No 41 (Stat Ann 1958 Rev § 13.790[181] *et seq.*) (authorizing conveyance to Detroit Edison Company of a marshy and rocky area opposite Harbor Beach); PA 1955 (1st Ex Sess), No 8 (Stat Ann 1958 Rev § 13.790[271] *et seq.*), (authorizing conveyance to the Abitibi Corporation of an area of filled lake bottom opposite Alpena); PA 1959, No 11 (authorizing conveyance to Consumers Power Company of an easement for specified purposes in and over certain submerged portions of Lake Michigan); PA 1959, No 31 (authorizing conveyance to Detroit Edison Company of a shallow and polluted portion of the bed of Lake Erie in Monroe county); and PA 1959, No 84 (CL 1948, §§ 254.141, 254.142) (authorizing conveyance, to the Mackinac county board of road commissioners, of an easement for construction of a bridge leading from one island to another in the Les Cheneaux group).

We agree with the attorney general that the public title and right is supreme as against National Gypsum's asserted right of wharfage, and hold that the latter may be exercised by the company only in accordance with the regulatory assent of the State.[5]

---

[5] If the company's allegation of supremacy—of the right of wharfage "to the channel"—is sound, would it not be possessed of right to

No such assent has been given and, for that reason alone, the chancellor erred in decreeing that National Gypsum might proceed with what in law has become, since entry of such decrees, an entry upon and unlawful detention of State property.

The same issue—of conflict of riparian rights with public rights—came to determination in *Hudson County Water Co.* v. *McCarter*, 209 US 349 (28 S Ct 529, 52 L ed 828, 14 Ann Cas 560). There the defendant riparian proprietor (Hudson County Water Co.) sought to draw water from the Passaic river, in New Jersey, for transportation by pipe line to Staten Island in the State of New York. New Jersey objected, assigning as superior the public right. New Jersey was upheld. The court, speaking through Mr. Justice Holmes, reasoned to its decree of affirmance as follows (p 356):

"This public interest is omnipresent wherever there is a State, and grows more pressing as population grows. It is fundamental, and we are of opinion that the private property of riparian proprietors cannot be supposed to have deeper roots. Whether it be said that such an interest justifies the cutting down by statute, without compensation, in the exercise of the police power, of what otherwise would be private rights of property, or that apart from statute those rights do not go to the height of what the defendant seeks to do, the result is the same. * * * The private right to appropriate is subject not only to the rights of lower owners but to the initial limitation that it may not substantially diminish one of the great foundations of public welfare and health."

The supreme court held further in this case that a State has constitutional power to insist that its

---

extend the dock (assuming Federal consent as in the case of the proposed aerial tramway) a total of 6,000 feet eastward from the shore? Would not every riparian of Great Lakes shallows have a similar right?

natural advantages shall remain unimpaired, and that when that State "finds itself in possession of what all will admit to be a great public good," it may as against such asserted claim of a riparian retain what it has "and give no one a reason for its will." This is good law for the cases before us, and we adopt it.

The supreme court held, in the *Illinois Central Case* (pp 445, 446), and we now hold, that:

"The riparian proprietor is entitled, among other rights, as held in *Yates* v. *Milwaukee,* 10 Wall (77 US) 497, 504 (19 L ed 984), to access to the navigable part of the water on the front of which lies his land, and for that purpose to make a landing, wharf or pier for his own use or for the use of the public, subject to such general rules and regulations as the legislature may prescribe for the protection of the rights of the public."

The reason for this rule appears later in the report, starting on page 453 and carrying on to page 454. The reason:

"The State can no more abdicate its trust over property in which the whole people are interested, like navigable waters and soils under them, so as to leave them entirely under the use and control of private parties, except in the instance of parcels mentioned for the improvement of the navigation and use of the waters, or when parcels can be disposed of without impairment of the public interest in what remains, than it can abdicate its police powers in the administration of government and the preservation of the peace. In the administration of government the use of such powers may for a limited period be delegated to a municipality or other body, but there always remains with the State the right to revoke those powers and exercise them in a more direct manner, and one more conformable to its wishes. So with trusts connected with public prop-

erty, or property of a special character, like lands under navigable waters, they cannot be placed entirely beyond the direction and control of the State."

No one (riparian proprietors included) has the right to construct for private use a permanent deep water dock or pier on the bottom lands of the Great Lakes—adjacent to Michigan—unless and until he has sought and received, from the legislature or its authorized agency, such assent based on due finding as will legally warrant the intended use of such lands. Indeed, and aside from the common law as expounded in *Illinois Central,* the legislature bids us construe its design and purpose "so as to preserve and protect the interests of the general public" in such submerged lands and as authorizing the sale, lease, exchange or other disposition of such submerged lands when and only when it is "determined by the department of conservation that such lands have no substantial public value for hunting, fishing, swimming, pleasure boating or navigation and that the general public interest will not be impaired by such sales, lease or other disposition." See PA 1955, No 247, § 2, as amended by PA 1958, No 94 (CLS 1956, § 322.702, as amended [Stat Ann 1959 Cum Supp § 13.700(2)]). For want of such determination the decrees below were unfounded, and so they must be reversed.

In the cases before us Michigan's great natural resource, providing as it does general public enjoyment of the pure blue waters of these incomparable inland seas, is subtly threatened by a projected rule of the common law—the riparian right to wharf out. We recognize the rule and the right, yet hold them subject to reasonable regulation by the State. In effect and in sum, this Court is asked by National

Gypsum and recent intervening parties[6] to grant such rule an untrammeled legal beachhead on this limited part of Tawas bay. Convinced that any such grant would open our shoal waters and renowned miles of sandy beaches to ruthless and uncontrolled exploitation, we are not so inclined.

### Second: The Question of Nuisance.

Nothing in the law of nuisance is better settled than this rule: that the locality and surroundings of the challenged operation or thing become an important factor in arriving at proper judicial decision of existence or nonexistence of an actionable nuisance. That which would be actionable or abatable in one place or locality might not be such in another. The oft-quoted observation of the supreme court (*Village of Euclid* v. *Ambler Realty Co.*, 272 US 365, 388 [47 S Ct 114, 71 L ed 303, 54 ALR 1016]) comes to mind here: "nuisance may be merely a right thing in the wrong place,—like a pig in the parlor instead of the barnyard."

Turning to the facts we find that, prior to National Gypsum's "invasion" (as it was termed below) the entire bay front, extending at least 4 miles southwesterly from the lower outskirts of Tawas City and including the immediate area in question, was devoted exclusively or substantially so to full-time and summer-time living in cottages and homes situated in a beautifully wooded sector lying between the continuous sand beach of the bay and highway US 23. At this point the highway extends along a "ridge" overlooking Saginaw Bay—through the trees —and paralleling the beach at distances varying from 400 to 1,200 feet. The slope from the highway

---

6 Dunbar & Sullivan Dredging Co., The River and Harbor Improvement Association, and the Maritime Trades Department of the AFL–CIO.

to the beach is for the most part gradual, making in all an ideal region for the quiet enjoyment of cottage and summer life on one of the scenic arms of Lake Huron.

Now, with the dredging done and the dock constructed near the approximate center of this sector, we are persuaded by the record that National Gypsum has moved an otherwise lawful industrial operation into an area constituting the wrong place for it. In so doing it has actionably offended the personal and property rights of these plaintiffs and, the *"fait"* being *"accompli"* now beyond judicial abatement, has subjected itself to payment of damages to such of these plaintiffs as may on remand be able to prove same.[7]

The testimony submitted before the chancellor was predictive, that is, the plaintiffs and their witnesses deposed largely to opinions that the planned operations of National Gypsum would, if permitted, create an abatable nuisance as charged; whereas witnesses for National Gypsum deposed to contrary opinions, the purport thereof being that all such fears were groundless in that the company could and would prevent objectionable noises; could and would prevent pollution of the air by dust and pollution of the water by bilge and other foul discharges from incoming, outgoing, and moored ships, and that its proposed method of dock construction would not cause changes of the beaches in the vicinity.

Now, since these cases must be disposed of on remand, new testimony based on the actual experience of the past 18 to 24 months should be of greater worth than that shown in the present record.

---

[7] For a general statement of the measure and elements of damages which, assuming satisfactory proof is submitted in support thereof, are recoverable in cases where an unabatable and actionable nuisance is of permanent nature, see 39 Am Jur, Nuisances, §§ 134 through 137, pp 395–400, and additions to text appearing in the 1960 pocket supplement, pp 56–58.

Have objectionable noises emanated from the belts and conveyor machinery, and from the moored ships themselves, during loading operations? Has there been an offensive discharge of smoke, bilge water, and other forms of pollution (of air and water) from the moored ships? Is the beach front changing, or beginning to change, on account of the dredged-out area and the effect of the dock on the action of waves and shore currents? Does the conveyor operation discharge gypsum dust which in some degree affects the comfort and enjoyment of nearby cottage life and beach recreation? Does the dock and the loading operation tend to destroy view and so affect, actionably, the value and enjoyment of plaintiffs' property?

These and other questions of like relevance are serious. They deserve testimonial exploration on the basis of *what is,* rather than what the witnesses expected—in early 1958—*would be.* So far, National Gypsum having proceeded to construct and operate a purpresture in an area theretofore devoted to detached private enjoyment of home and bay front, these plaintiffs have established a *prima facie* case of actionable nuisance. So, if it is shown on remand that the company's operations have destroyed in provable degree the comfortable, peaceful, and quiet occupation of any nearby home or cottage, the right of the plaintiff owner to monetary relief will be upheld by the successor chancellor.

They, these plaintiffs, were "there first." As the chancellor, having posed the initial question "Who was here first," observed in his opinion:

"As to point 'a', it is clear that plaintiffs have the best of the argument, and are entitled to the benefit of all that has been said in the decisions against avoidable or unnecessary interference with the enjoyment of their property or anything which will tend to lessen values. Quite naturally, they feel

that the defendant is an invader of their domain and their privacy, and should be relegated to some other method of getting its gypsum rock on shipboard."

Summary: Equity cannot now abate that which, originally, should have been enjoined. Such a decree would amount to outright destruction and loss of valuable property constituting an even greater wrong than that which the company has perpetrated. The dock may remain existent and operable but subject always to the will of the State as provided in the quoted portion of the provisional permit of August 12, 1958, and subject further to such decretal provisions for control of its use as equity may decide on new testimony to impose.

. The decrees below are reversed and the cases are remanded to the Iosco county circuit court for further proceedings to be conducted by the successor chancellor in accordance with this opinion. Plaintiffs and the intervening State will have costs.

Dethmers, C. J., and Carr, Kelly, Smith, Edwards, and Souris, JJ., concurred.

Kavanagh, J., did not sit.