## STATE v. H. L. KULUVAR.

123 N. W. (2d) 699.

October 4, 1963—No. 38,903.

Cyclops Steel Corp. (W. D. Pa.) 1 F. R. D. 533; New England Terminal Co. v. Graver Tank & Mfg. Corp. (D. R. I.) 1 F. R. D. 411.

*Mandt Torrison* and *Bundlie, Kelley & Torrison,* for appellant.

*Walter F. Mondale,* Attorney General, *Frank J. Murray,* Deputy Attorney General, *Lawrence J. Vaubel* and *Victor J. Michaelson,* Special Assistant Attorneys General, and *John D. Furuseth,* Special Assistant County Attorney, for respondent.

ROGOSHESKE, JUSTICE.

Defendant appeals from a judgment of conviction following a verdict finding him guilty of violating Minn. St. 105.42, relating to interference with public waters subject to state control. Defendant is a partner in the operation of a resort located on a bay of Rainy Lake known as Jack Fish Bay. The resort, Northernaire Floating Lodges, is situated on five platted lots, a part of Forest Point, which the partnership purchased from the state through Koochiching County in September 1957. Each lot is 100 feet in width, the total being 500 feet from east to west. The lengths of the lots vary. Each begins at a dedicated east-west access road and runs south to the irregular shoreline

of the lake. Defendant's most easterly lot, Lot 35, extends a substantial distance farther into the lake than the other lots, forming a point where its easterly boundary extends to the shoreline. From this point, the shoreline of this lot recedes sharply inland toward the west to Lot 34, the water in front of this lot presumably being quite shallow. Lot 36, the west line of which is the east line of defendant's tract, is also a part of the point, the shoreline of which recedes slightly inland toward adjoining Lot 37.

The waters of Rainy Lake were made international boundary waters by the Webster-Ashburton Treaty of 1842. The water levels are controlled through the dams of the O & M Paper Company and are subject to regulation and control by the International Joint Commission, consisting of six members, established by the Treaty of Ghent made by the United States and Great Britain in 1909. Sometime in 1958, defendant obtained a permit from the United States Corps of Engineers to improve the floating of boats into his resort. The permit was not offered into evidence and we are not informed of its precise language and purpose, but it is unchallenged in the record that under this permit defendant dug a channel adjacent to the easterly boundary line of Lot 35 for the purpose of providing a flotation way for watercraft. From the testimony and exhibits introduced, it appears that the channel was constructed by excavating part of Lot 35 for about 300 feet. The evidence does not disclose to what extent, if any, the natural point of Lot 35 was extended into the waters of the bay. The excavated materials were deposited upon the easterly part of Lot 35 against cribbing or pilings which were placed along the easterly boundary line of defendant's tract, creating what might be described as a wharf. As a survey map indicates, numerous large pilings were also placed around the point and three rows extended along the westerly edge between the wharf and the channel. The work of originally constructing the channel was not included in the charge against defendant. About November 28, 1960, and again in March 1961, admittedly without a permit from either Federal or state authorities, defendant employed the contractor who dug the original channel to clean it out. This contractor, called by the state, testified that he spent more than

a week in removing ice, rock, muskeg, and clay from the channel bed which was then mainly below the surface of the ice and water. The materials removed were deposited on both sides of the channel, that on the east being placed on the wharf previously described and that on the west forming an island in front of Lot 34 parallel to the channel and extending beyond the point of Lot 35. The channel lay between the wharf and the island. When the survey from which the map was drawn was made on March 23, 1961, the island created measured 300 feet in length and at no point was it less than 35 feet in width. Its highest point above the water level was in excess of 10 feet. The highest point above the water level of the wharf was about 7½ feet. The record does not reveal the height of the wharf as it existed before the operations in November and March. The contractor explained that he had been unable to do a "good job" originally because of the large amount of rock, and that his efforts in November and March were for the purpose of "just cleaning out the old channel" and not to dig a new one.

This activity formed the basis of the charge filed against defendant. The proceedings appear to have been provoked by the complaints of the owner of Lot 36, adjacent to which the wharf was created and against the west line of which some of the additional materials removed were deposited. The complaints resulted in an investigation by the local game warden and thereafter this prosecution was instituted. The information alleged that on or about November 28, 1960, defendant "did wrongfully and unlawfully change the cross-section of certain public waters, to wit: Rainy Lake, by then and there digging and moving from one place to another from the bed of said lake certain soil, sand, gravel, and other materials therein," without previously obtaining a written permit from the commissioner of conservation in violation of § 105.42.

Section 105.42 is one of the sections of our water resources law (§§ 105.37 to 105.55) revised and codified after a legislative interim study in 1947. The pertinent provisions of § 105.42 are:

"Except in the construction and maintenance of highways when the control of public waters is not affected, it shall be unlawful for

the state, any person, partnership, association, private or public corporation, county, municipality or other political subdivision of the state, to * * * in any manner * * * change or diminish the course, current or cross-section of any public waters, wholly or partly within the state, without a written permit from the commissioner previously obtained."

The trial court instructed the jury that the charge required proof "first of all: that Rainy Lake and particularly Jack Fish Bay is public water; secondly, that the defendant did the work here complained of in the lake bed of Rainy Lake so that it changed the cross-section, and by changing the cross-section it would be widening, filling, or deepening—that is the changing of the contour of the bed of the lake; third, that the act was committed in Koochiching County; fourth, the defendant had no written permit therefor from the Department of Conservation; and fifth, that it was against public interest." Defendant was found guilty and sentenced to pay a $400 fine and serve 4 months in jail, his commitment being tentatively stayed upon certain conditions. Thereafter, defendant paid the fine and, after hearing before the court, was found in default of performance of the conditions and ordered committed.

■ The state moves to dismiss the appeal upon the ground that defendant waived his right to review, citing State ex rel. Weich v. City of Red Wing, 175 Minn. 222, 220 N. W. 611. It is claimed that defendant not only paid the fine, but also undertook to comply with the conditions to effect a suspension of the jail sentence, thus acquiescing in the judgment which in effect now stands fully executed. The conditions imposed required, among other things, that defendant secure a permit from the commissioner of conservation for the work already done and that he negotiate a settlement of his dispute with his neighbor. Defendant was required to report to the court within 60 days; and any unreasonable actions by third parties, as well as the efforts and good faith of defendant to accomplish compliance, were subject to further review by the sentencing court to determine finally whether commitment to jail should be ordered or suspended. At the postponed hearing, defendant related his efforts to comply and claimed that his neighbor's demands for damages or, in the alternative,

for purchase of his property were unreasonable. He also testified that he understood that the state was holding his application for permit in abeyance pending his reaching an agreement with his neighbor. The court found defendant's efforts inadequate and his attitude disobedient of the court's order.

Whatever may have justified the court in exercising discretionary authority to impose a severe sentence, the conditions required to avoid commitment were most extraordinary and, to say the least, of questionable validity. In any event, defendant was ordered committed to jail, the execution of the sentence being stayed pending appeal. Clearly, where the judgment in one significant and essential part is unexecuted, there is no acquiescence and the judgment is appealable. Cf. State v. Boulton, 229 Minn. 576, 40 N. W. (2d) 417.

Defendant's appeal presents three issues, namely, the jurisdiction to enforce a state regulatory statute on international boundary waters, the constitutionality of the statute, and the sufficiency of the evidence to sustain the conviction.

■ It has long been recognized that Congress can constitutionally exclude the state in regulating these boundary waters under the commerce clause and the treaty-making power.[1] It is also well established that in the absence of any action the power to regulate reposes in the state.[2] Congress may also elect to occupy the field concurrently with the state and in such instances state regulations are valid and effective except where they conflict with Federal authority. Where the conflict claimed is not clear, any doubts must be resolved in favor of the dominant Federal authority.[3] Defendant's claim of lack of jurisdiction in the state is based entirely upon the 1909 treaty, pursuant to which, he argues, the control and regulation of these boundary

---

[1] Wisconsin v. Duluth, 96 U. S. 379, 24 L. ed. 668.

[2] Willamette Iron Bridge Co. v. Hatch, 125 U. S. 1, 8 S. Ct. 811, 31 L. ed. 629; Minnesota Canal & Power Co. v. Pratt, 101 Minn. 197, 112 N. W. 395, 11 L. R. A. (N. S.) 105.

[3] United States v. Twin City Power Co. 350 U. S. 222, 76 S. Ct. 259, 100 L. ed. 240; United States v. Chandler-Dunbar Co. 229 U. S. 53, 33 S. Ct. 667, 57 L. ed. 1063.

waters was reserved and preempted by the United States and Canada and vested in the International Joint Commission thereby created. He relies upon Article III and Article VIII which provide in part:

"It is agreed that, in addition to the uses, obstructions, and diversions heretofore permitted or hereafter provided for by special agreement between the Parties hereto, no further or other uses or obstructions or diversions, whether temporary or permanent, of boundary waters on either side of the line, affecting the natural level or flow of boundary waters on the other side of the line, shall be made except by authority of the United States or the Dominion of Canada within their respective jurisdictions and with the approval, as hereinafter provided, of a joint commission, to be known as the International Joint Commission."

"This International Joint Commission shall have jurisdiction over and shall pass upon all cases involving the use or obstruction or diversion of the waters with respect to which under Articles III and IV of this treaty the approval of this Commission is required * * *."

These provisions contain no express exclusion of state jurisdiction and we ascertain no exclusion by implication. The statute before us negatives any direct conflict as it prohibits anyone except the Federal government from interfering with public waters in any manner detrimental to public interest. The treaty vests jurisdiction in the International Joint Commission to pass upon all cases in which the "natural level or flow" is affected. The mere fact of overlapping jurisdiction which would require one interfering with these waters to comply with the requirements established by the agencies of two sovereigns is not a sufficient basis for an inference that a conflict exists which would oust the state of jurisdiction.[4] The record discloses no more than the likelihood that defendant may be subjected to the regulations of

---

[4] Pigeon River Co. v. Cox Co. 291 U. S. 138, 54 S. Ct. 361, 78 L. ed. 695; Cummings v. Chicago, 188 U. S. 410, 23 S. Ct. 472, 47 L. ed. 525; Niagara Mohawk Power Corp. v. Federal Power Comm. 91 App. D. C. 395, 202 F. (2d) 190, affirmed, 347 U. S. 239, 74 S. Ct. 487, 98 L. ed. 666; In re Settlement of Beaulieu, 264 Minn. 406, 119 N. W. (2d) 25.

both the joint commission and the state. No showing is made that compliance with the requirements sought to be imposed by the state conflicts or in any manner interferes with the exercise of power vested in the agency created by the treaty. It follows that the state has jurisdiction to proceed against defendant.

■ Defendant next contends that the statute is unconstitutional because it does not meet the test of clarity required of a criminal statute, and that the prosecution attempted deprives him of his riparian property rights without due process of law.

The water resources law, of which § 105.42 is an integral part, is designed, as expressly declared in § 105.38, "to conserve and utilize the water resources of the state in the best interests of the people of the state, and for the purpose of promoting the public health, safety and welfare, * * *." All waters in lakes or streams "which are capable of substantial beneficial * * * use" are declared to be public waters subject to state control under authority delegated to the commissioner of conservation. Subject to existing rights and expressly disavowing any intention to affect determination of the ownership of the underlying bed, the legislature has expressly declared its intention that the control authorized extend to all waters declared public waters within the state, navigable or nonnavigable, and wherever located.[5] Under this comprehensive policy, the public interest is sought to be protected by requiring that any person, including public agencies, obtain a written permit from the commissioner of conservation prior to engaging in activities which may affect the natural state of public waters, including surface and underground waters.[6] Statutory provisions require that upon demand a full hearing must be granted to any applicant.[7] Detailed procedures for giving notice, the conduct of the hearing (including the making and preserving of a record), making findings of fact, and for appeals are provided.[8] The standards governing the com-

---

[5]Minn. St. 105.38(1).

[6]§§ 105.41, 105.42, and 105.44, subd. 8.

[7]§ 105.44, subd. 3.

[8]§§ 105.44, 105.45, and 105.47.

missioner's determination to grant or refuse the permit are specifically enumerated in § 105.45, which provides in part:

"If the commissioner concludes that the plans of the applicant provide for the most practical use of the waters of the state and will adequately protect public safety and promote the public welfare, he shall grant the permit * * *. If the commissioner concludes that the proposed appropriation or use of state waters or the proposed construction is inadequate, wasteful, dangerous, or impractical, or detrimental to the public interest, he shall reject the application * * *."

Rules governing statutory construction require that § 105.42 be read in conjunction with the foregoing provision. Its prohibitions are not directed at interference with the bed or with riparian rights but against interference with the natural condition of public waters. Section 105.42 prohibits any act which would "change or diminish the course, current or cross-section of any public waters." The "course" or "current" evidently refers to flowing waters. The prohibition against changing the cross-section refers to any change from the natural condition discernible in a view of the waters as they would appear if cut through by an intersecting plane; in short, as it would appear in a cross-section view of the waters in relationship to the basin in which they are contained or the bed over which they flow. The critical word "change" must be viewed in the context of related provisions, the underlying policy expressed, and the objects to be attained.[9] Clearly, the legislature did not intend that every change apparent in a cross-section view of the waters or every act of excavating or filling be prohibited, for such a construction could result in absurd application. As suggested by defendant, many acts which would technically result in a change in the cross-section view are so minimal as to be of no significance to the public interest. Surely, there could also be changes which, although significant in physical effect, would enhance rather than harm the public interest. As provided in § 105.45, enumerating the standards which would justify the commissioner in refusing a permit to change the cross-section of a lake in a case such as the one before us, it must be

---

[9] § 645.16.

found to be "wasteful" or "dangerous" or, above all, "detrimental to the public interest." The broad interest of the public in the beneficial use of the numerous and varied lakes of Minnesota does not lend itself to cataloging the countless ways in which any particular interference with public waters may be detrimental to public use and enjoyment. The standard must necessarily be broad and rest upon the application of judgment to a given set of facts. Moreover, the character of the change must be one which affects the public as distinguished from private interest. The statute is not designed to protect private rights, since a remedy for their infringement is available. Only in cases where interference with private use also results in detriment to the public generally can the statute be employed to protect private rights. Indeed, it is readily conceivable that riparian owners might desire changes which would be manifestly detrimental to rights peculiar to the public. To justify prosecution and to sustain a conviction under the statute, it must be established not only that the waters are capable of beneficial use and that the public could enjoy, or has enjoyed, such use of the waters before the change but that such use—past, present, or reasonably likely in the future—has been detrimentally affected by the change.

It is true, as urged by defendant, that due process requires a statute imposing criminal sanctions to be sufficiently explicit to inform those required to comply with it of the conduct forbidden or required, in such terms that men of ordinary intelligence need not guess at its meaning and that they will not necessarily differ as to its application. However, this rule does not preclude the use of broad, flexible standards in a penal statute which necessarily exposes one subject to it to the exercise of judgment.[10] Constitutionally prohibited uncertainty invalidates a statute only when those subject to it cannot determine with reasonable certainty whether a particular act is forbidden or permitted. State v. Suess, 236 Minn. 174, 52 N. W. (2d) 409; State v. Northwest Poultry & Egg Co. 203 Minn. 438, 281 N. W. 753. Here no such uncertainty exists. Defendant was directed to apply for a permit to engage in activities which obviously interfered with waters

[10] State v. Bolsinger, 221 Minn. 154, 21 N. W. (2d) 480.

used, and susceptible of beneficial use, by the public. Whether such contemplated activity, then known only to him, would be detrimental to the public use and enjoyment involved a risk of judgment. It is neither uncertain nor unreasonable to require him to comply with the provisions and apply for a permit when he knows or reasonably is required to know that his activity may affect the public interest. We conclude that the statute does not offend due process in this respect.

It is fundamental, in this state and elsewhere, that the state in its sovereign capacity possesses a proprietary interest in the public waters of the state. Riparian rights are subordinate to the rights of the public and subject to reasonable control and regulation by the state.[11] Section 105.42 regulates the property rights of a riparian owner only to the extent of prohibiting any interference with the waters adjoining if such waters are public waters and if the interference is detrimental to public use. Such a regulation cannot be regarded as unreasonable and certainly not as taking property without compensation. When it is established that the public has access to waters capable of substantial beneficial use by all who so desire, the statute directs that the state fulfill its trusteeship over such waters by protecting against interference by anyone, including those who assert the common-law rights of a riparian owner. To permit such owners to interfere with the natural rights of the public to fish, hunt, swim, navigate, and otherwise enjoy such waters would result in subordinating public rights to private rights and in abdicating the state's trust over an incomparable natural resource. We find no difficulty in holding that the statute is a reasonable regulation and that it does not unconstitutionally infringe upon any rights of a riparian owner, including the rights to use his land above the ordinary low-water mark, the right to wharf out to the point of navigability, or rights arising because of the claimed ownership of the bed underlying any waters declared public by § 105.38.

■ As we construe the statute, the essential elements of the charge against defendant, under which the sufficiency of the evidence must be examined, required proof that defendant's dredging and filling in-

---

[11]13A Dunnell, Dig. (3 ed.) § 6950; Obrecht v. National Gypsum Co. 361 Mich. 399, 105 N. W. (2d) 143.

terfered with waters proven to be public under the law, and that the change made resulted in a detriment to the public either in its present or prospective use of the waters. From the record it is apparent that the theory of the prosecution and the court's instructions emphasized a change in the bed of the lake rather than a detrimental interference with public waters as the gist of the charge against defendant. The defendant contributed to this emphasis by claiming as a defense that his activities were a lawful exercise of his riparian rights and by his attempt to prove ownership of the bed of the lake. While it is true that one cannot dredge the bed of a lake without changing the cross-section of the waters, emphasizing the effect on the bed detracts from the most important objective of the law, namely, to prohibit acts which interfere with public rights in these waters. The record discloses no evidence tending to prove public detriment and therefore there must be a new trial. There is ample proof from eyewitnesses, the contractor who did the dredging, and the survey or contour map that a change was in fact made in the cross-section view of the waters; but there is no evidence which would support a finding that the beneficial use of these waters by the public was affected in any detrimental manner. As defendant appears to concede, the jury could have inferred from the facts that defendant operated a resort and that the public did in fact beneficially use the waters for navigation, that they are public waters within the definition of the law. However, there is no basis upon which the jury could reasonably have inferred that the construction of the channel interfered with any navigable use of the waters enjoyed by the public. On the contrary, the only permissible inference from the evidence is that navigability was thereby improved. It may be that the public made other use of these waters or that they are susceptible of other substantial beneficial use and that the change made interfered with such uses. No claim or evidence suggesting other uses was shown by the record.

As there must be a new trial, we decline to review the error claimed in admitting the survey map. We observe, however, that no reasons appear in this record why witnesses possessing firsthand knowledge of the facts portrayed by the map so vital to the state's case should not

have been required to confront defendant and be subject to cross-examination. We are not persuaded that the record supports the state's claim that a sufficient foundation existed to receive the exhibit as an official record under Minn. St. 600.13.

Reversed and new trial ordered.