STATE of Minnesota, Respondent,

v.

James Paul FEEHAN, Appellant.

No. C4–86–1827.

Court of Appeals of Minnesota.

Sept. 15, 1987.

Review Denied Nov. 12, 1987.

Hubert H. Humphrey, III, State Atty. Gen., St. Paul, John R. Leitner, Aitkin Co. Atty., Aitkin, for respondent.

Samuel A. McCloud, Dean S. Grau, Minneapolis, for appellant.

Heard, considered and decided by POPOVICH, C.J. and FOLEY and HUSPENI, JJ.

## OPINION

FOLEY, Judge.

James Paul Feehan appeals from a judgment entered pursuant to a jury verdict finding him guilty of working in protected waters without a permit in violation of Minn.Stat. §§ 105.41 and 105.42 (1984). On appeal, he raises a number of issues relating to admission of evidence at trial. He also contends that section 105.42 is unconstitutionally vague. We affirm in part, reverse in part and remand.

## FACTS

This case involves the unauthorized use of public waters, specifically Big Sandy Lake, a reservoir in Aitkin County, Minnesota. During the summer of 1985, Feehan purchased approximately 140 yards of sand and had it delivered to his property adjoining the lake. Shortly thereafter, one of Feehan's neighbors observed him hauling the sand to the lake and depositing it on a plastic sheet.

In August 1985, State Conservation Officer Dennis Lang inspected Feehan's property in response to the neighbor's complaint of a possible filling violation. Lang testified that he observed an approximate 50 × 60 feet area of fresh filling over aquatic vegetation, an activity that he believed exceeded the scope of Feehan's 1984 permit. Lang contacted the regional waters office to determine whether Feehan had been issued a permit for the work performed and to elicit an opinion on whether the work violated the law. Howard Christman, a Department of Natural Resources area hydrologist, informed Lang that a new application had not been filed nor had a permit been issued for the work.

Christman personally inspected the property two days later. He testified that in addition to a fill strip authorized by the 1984 permit, he observed a fresh 50 × 60 foot sand fill on either side of the strip,

underlain by a plastic sheet. The 1984 permit did not authorize this filling.

Christman returned to the property about a week later with Terry Ladd of the Army Corps of Engineers and Don Daley, operator of the Big Sandy Lake Dam, for the general purpose of conducting topographical measurements. The specific purpose of the studies was to determine what, if any, portions of the new fill were below Big Sandy Lake's normal summer pool and thus within public waters.[1] Christman testified that the normal summer pool for Big Sandy Lake was 1216.56 feet above sea level.

The diagrammed results of the survey indicated that the ground elevation of the fill was almost entirely below the normal summer pool. In Christman's opinion, the fill changed the cross current of the Big Sandy Lake reservoir. Christman acknowledged, however, that only two points of the fill were below the *lower* range of the normal summer pool, 1216.06 above sea level. He further acknowledged that if significant compaction of the ground beneath the sand occurred, topographical measurements would reflect a lower elevation. Christman agreed that to arrive at a precise level of elevation in such a case, measurements prior to the fill would have been necessary.

Feehan testified that the °fill area was approximately 10 inches above the normal summer pool before he started the project and that soil compaction was responsible for elevation figures below the legal limit. He explained that use of a 4000 pound tractor trailer to distribute the sand caused significant compaction of up to 10.08 inches. Feehan's calculations were based upon water level figures for Big Sandy Lake on the day of his measurements.

On redirect over objection for lack of foundation, Christman testified that significant compaction had not occurred in the instant case, at most one to two inches. He based his opinion on the absence of mudwave at the fringes of the fill area and on the absence of a concave depression beneath the fill. Christman admitted that he had not actually tested the soil to determine whether compaction occurred and agreed that if the ground surface underneath the fill was "bumpy", a mudwave would not likely exist.

After the jury was selected, but prior to opening statements, the State informed the court of its intent to introduce evidence during its case-in-chief of Feehan's prosecution for a similar violation in 1984. Apparently, Feehan had pleaded guilty to the charge of working in public waters without a permit, which was taken under advisement, and the charges were later dismissed pursuant to an agreement whereby Feehan applied for and received the necessary permit.

The prosecutor asserted that evidence of the prior violation and discussions pertaining to it were highly relevant in proving absence of mistake as it pertained to the current charge. Defense counsel objected to the evidence on grounds that: (1) the prosecutor failed to give proper *Spreigl* notice of his intent to introduce the prior violation; (2) regardless of lack of notice, the 1984 violation was inadmissible as a prior conviction since the guilty pleas was taken under advisement and the charges subsequently dismissed; and (3) since unauthorized use of public waters is not a specific intent crime, the evidence was irrelevant. The trial court ruled:

> Well, I will let [the prosecutor] go into the conversation and conference that occurred after that first charge indicating the knowledge of the defendant as to what he can and can't do. If he takes the stand, then you are able to go into all of it, *but in your case in chief I will let you go to the knowledge aspect for the sole purpose of establishing knowledge of the offense, this new offense, not the previous offense, that is totally prohibitive.* The court's ruling on a 403 call being prejudicial.

1. Minn.Stat. § 105.37, subd. 16 (1984) provides that the boundary of public waters is to be determined by the "[o]rdinary high water level." For reservoirs like Big Sandy Lake "the ordinary high water level shall be the operating elevation of the normal summer pool." Minn. Stat. § 105.37, subd. 16.

**312**

Also pertinent to this appeal are various objections Feehan raised prior to testimony of the first witness: (a) Minn.Stat. § 105.42 (1984) is unconstitutionally vague; (b) his conviction should be reversed because the prosecutor failed to give proper *Rasmussen* notice of its intent to use topographical measurements derived from a search and seizure of his land; and (c) the topographical measurements were inadmissible because they were gathered in a manner violative of his fourth amendment rights. Feehan additionally asserts that the prosecutor essentially ignored the trial court's limitation on evidence pertaining to his previous violation and introduced the evidence to impermissibly prove bad character.

### ISSUES

1. Is Minn.Stat. § 105.42 (1984) unconstitutionally vague?

2. Did the on-site inspection conducted by a DNR hydrologist implicate Feehan's fourth amendment rights and require the prosecutor to give notice pursuant to Minn. R.Crim.P. 7.01?

3. Was the prosecutor required to give *Spreigl* notice pursuant to Minn.R.Crim.P. 7.02 of his intent to introduce evidence of a prior incident for which Feehan had been previously prosecuted?

4. Are additional issues by Feehan challenging admission of this evidence properly before this court?

5. Did the trial court err in allowing the hydrologist to render an expert opinion on the level of compaction resulting from Feehan's filling of the lake?

6. Is Feehan's claim that the trial court erred in permitting the hydrologist to render an opinion based upon hearsay information properly before this court?

### ANALYSIS

#### I

█ Feehan's constitutional challenge to Minn.Stat § 105.42 (1984) is without merit. In *State v. Kuluvar*, 266 Minn. 408, 123 N.W.2d 699 (1963), the supreme court held that section 105.42 on its face was not unconstitutionally vague, and did not deprive a riparian owner of his property without due process of law. *Id.* at 417–18, 123 N.W.2d at 706. Feehan argues, however, that even if the statute is facially valid, it was invalidly applied to his conduct. We disagree. In view of Feehan's previous experience with the same statute, we need not elaborate on the basis for our decision.

#### II

Feehan contends that he is entitled to reversal of his conviction because the prosecutor failed to provide *Rasmussen* notice that topographical measurements obtained as a result of "search and seizure" would be used at trial. *See* Minn.R.Crim.P. 7.01; *State ex rel Rasmussen v. Tahash*, 272 Minn. 539, 141 N.W.2d 3 (1965). He further claims that the warrantless "search" of his property and the "seizure" of measurements violated his fourth amendment rights. Case law plainly supports the conclusion that the fourth amendment was not implicated in this case.

█ In order to suppress evidence on fourth amendment grounds, a defendant must show that he has standing to raise the issue. As applied to the present facts, Feehan must show a proprietary or possessory interest in the area where the topographical studies were conducted. *See Brown v. United States*, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973). Here, the area in question was part of a lake managed by the Army Corps of Engineers. Certainly, Feehan does not have a proprietary interest in waters under the direct control of a government agency.

█ Moreover, even if it were assumed that all or part of the activity was conducted in an area within Feehan's property line, he would not have standing to assert a fourth amendment violation if the area was not one in which he maintained a *reasonable* expectation of privacy. *See Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

The evidence established that Feehan was informed by government officials in 1984 that his filling at that time, without a

permit, was conducted in public waters. It is inconsistent for Feehan to claim now that he had reasonable expectation of privacy in this area and particularly so since the DNR is specifically authorized to investigate activities relating to use of public waters without a permit and specifically empowered to enter upon any land in order to carry out these duties. *See* Minn.Stat. § 105.462 (1984).

### III

Minn.R.Crim.P. 7.02 codifies the rule in *State v. Spreigl,* 272 Minn. 488, 139 N.W.2d 167 (1965), and requires the prosecution to give notice of prior offenses it intends to use at trial. The notice must describe the additional offenses "with sufficient particularity to enable the defendant to prepare for trial." Minn.R.Crim.P. 7.02. In misdemeanor cases, written notice must be given at or before the pretrial conference or, if no pretrial conference is held, at least seven days before trial.

■ *Spreigl* recognized three exceptions to the notice requirement:

(a) Offenses which are part of the immediate episode for which defendant is being tried; (b) *offenses for which defendant has previously been prosecuted;* (c) offenses which are introduced to rebut defendant's evidence of good character.

*Spreigl,* 272 Minn. at 497, 139 N.W.2d at 173 (Emphasis supplied).

The State claims that notice was not required in this case because the prior incident fell within the second recognized exception in *Spreigl.* At trial, Feehan asserted that "previously prosecuted" meant previously *convicted.* He does not pursue this same argument on appeal, but instead contends that whether this exception remains good law is uncertain. We believe the law on this point is quite clear.

*Spreigl* notice is intended to remove the element of surprise at trial and allow the defendant sufficient time to plan his case, knowing that the evidence could come before the jury. This element of surprise does not exist when the prosecution seeks to introduce a previously prosecuted offense, particularly when the prior incident

is virtually identical to the current incident. Moreover, utilization of the phrase "previously prosecuted" is self-explanatory. If the court had intended the exception to apply only to previous convictions, we believe it would have so stated. Here, it is undisputed that Feehan was *prosecuted* for the 1984 incident. Subsequent dismissal of the case is not dispositive of the *Spreigl* issue.

### IV

■ Feehan alternately claims that even if *Spreigl* notice was not required in this case, evidence of the prior incident was impermissibly used to demonstrate his bad character. *See* Minn.R.Evid. 404(b). He also asserts that the trial court erred by failing to give a limiting instruction to the jury after this evidence was received. Neither of these issues are properly before this court.

During the State's case-in-chief, officer Lang was asked whether he went out to Feehan's property in 1984 to discuss a request for a permit. Lang responded, *without* objection: "No. It was in response to a complaint of a violation." During cross-examination, however, Lang was asked to elaborate on the content of his 1984 conversation with Feehan:

Q. [Defense counsel]: * * * did you tell Mr. Feehan that this particular strip of land was public waters?

A. [Lang]: Yes.

Q. You personally told him that?

A. Yes.

Q. All right. And based on what did you tell him that?

A. That was where we discussed what was aquatic and we kind of pointed out the boundaries of what was aquatic. We also discussed the elevations of the lake and the seasonal differences in elevation.

\* \* \* \* \* \*

Q. Well, does aquatic vegetation have anything to do with whether or not it is public waters or not?

A. Yes, that is one of the ways of determining the ordinary high water mark of the lake.

\* \* \* \* \* \*

Q. Mr. Feehan was also given a permit *to dredge out this area between these two sand spots here* [indicating on State's Exh. 1], is that correct, underneath the bridge?

A. *There was a restoral and on that restoral he was required to remove some.*

Q. *So he was required to take that out?*

A. *Some of that.*

(Emphasis supplied.) During Lang's redirect, the following exchange took place *without* objection:

[Prosecutor]: [Defense counsel] was asking you some questions about the original fill strip and you mentioned, he said that there was a dredging. \* \* \* [could you] point out to members of the jury where this area was in 1984 that he was required to move some fill from the lake?

[Lang]: [Pointing to exhibit] There was a large portion of fill put into the lake in 1984 *and there was a case against Mr. Feehan for that* \* \* \*. [H]is permit required him to remove some of what had been put in the lake but he was given permission to retain this fill strip.

(Emphasis supplied.)

 It is axiomatic that failure to object to evidence at trial constitutes a waiver of the right to claim this as error on appeal. *See State v. Clark,* 286 Minn. 419, 176 N.W.2d 123 (1970). Feehan will not now be heard to complain when he failed to preserve the record properly at trial. For similar reasons, we need not address whether the trial court erred in failing to give a limiting instruction. Feehan did not request such an instruction prior to submission of the case to the jury. In the absence of a request, the failure to give a limiting instruction is not reversible error. *State v. Forsman,* 260 N.W.2d 160, 169 (Minn. 1977).

**V**

 Minn.R.Evid 702 sets forth a liberal standard for qualifying a witness as an expert.

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Christman, a DNR hydrologist who had considerable experience with the type of sediment underlying the fill, was qualified to render an expert opinion on the level of compaction present in this case. *See Hagen v. Swenson,* 306 Minn. 527, 236 N.W.2d 161 (1975). The qualification of a witness to render an expert opinion is a decision for the trial court whose ruling will not be reversed unless it is based on an erroneous view of the law or is clearly not justified by the evidence. *Id.* 236 N.W.2d at 162. The ultimate value given to an expert's testimony in light of conflicting evidence was a question for the jury. *Christy v. Saliterman,* 288 Minn. 144, 179 N.W.2d 288, 303 (1970).

 Feehan also challenges the adequacy of foundation for Christman's opinion that only one to two inches of compaction occurred. In particular, he stresses the fact that Christman never actually conducted tests on the soil to determine the existence and extent of air and water variables. We agree that actual testing of the soil would have been preferable. However, the failure to do so does not compel the conclusion that Christman's opinion was rendered without adequate foundation.

Minn.R.Evid 703 provides:

The facts or data in the particular case upon which an expert bases an opinion or inference *may be those perceived by* or made known to him at or before the hearing.

Minn.R.Evid. 703 (emphasis supplied). Here, Christman testified based on his visual observations and concluded that the absence of a mudwave or a concave shape

beneath the fill was indicative of minimal compaction of soil. The jury was entitled to hear this testimony, as well as Feehan's conflicting testimony, and ultimately decide which witness was more credible.

## VI

Feehan claims that his constitutional right to confrontation was violated by Christman's reliance on water level figures provided by dam keeper Don Daly, who did not testify at trial. This argument is without merit. The record discloses no objection to the testimony on hearsay grounds.

Feehan lastly argues that he was improperly assessed the costs of prosecution. *See* Minn.Stat. § 631.48 (1984). Since the trial court did not make findings on Feehan's ability to pay these costs, we remand on this limited basis. *See State v. Ramstad,* 348 N.W.2d 391 (Minn.Ct.App. 1984).

## DECISION

Affirmed in part, reversed in part and remanded.