CROOKSTON CATTLE COMPANY et al., Appellants,

v.

MINNESOTA DEPARTMENT OF NATURAL RESOURCES, Respondent,

City of Crookston, Respondent.

No. 50134.

Supreme Court of Minnesota.

Dec. 12, 1980.

Rehearing Denied Jan. 27, 1981.

---

Popham, Haik, Schnobrich, Kaufman & Doty, Raymond A. Haik and Desyl L. Peterson, Minneapolis, for appellants.

Warren Spannaus, Atty. Gen., C. Paul Faraci, Deputy Atty. Gen., James M. Schoessler, Carl M. Conney, and Steven J. Johnson, Sp. Asst. Attys. Gen., St. Paul, for Minn. Dept. of Natural Resources.

Brink, Sobolik, Severson & Vroom and Robert K. Severson, Hallock, C. W. Kludt, Crookston, for respondents, for City of Crookston.

Jaroslav Kruta, Law Office, Warren, for Town of Lake Pleasant.

WAHL, Justice.

This case involves the proper allocation of groundwater between competing users. Petitioners, Crookston Cattle Company (hereinafter, the Company) and its sole owner, Ray G. Mair, appeal from an order of the Ramsey County District Court which affirmed the final order of the Acting Commissioner of the Minnesota Department of Natural Resources (hereinafter Commissioner's order). In the challenged order, the Department of Natural Resources (hereinafter DNR) granted the City of Crookston permission to construct two wells which would tap the same groundwater aquifers [1] sought to be utilized by the Company. Petitioners challenge this final order of the DNR as effecting an unconstitutional taking of private property without just compensation, as violative of certain statutory mandates, and as arbitrary and capricious. We affirm.

The City of Crookston (hereinafter City), an "agricultural service community" of 8,500 population, seeks to change the source of its municipal water supply from the Red Lake River to wells which tap groundwater. This change was recommended by the Minnesota Department of Health and is necessary, according to evidence in the record, because the present water plant is old and does not meet water quality standards, because groundwater is a safer, healthier and more reliable source than river water, and because maintenance costs for a groundwater supply are considerably lower than for a surface water system. For this purpose,

---

1. An "aquifer" is a water–bearing underground layer of sand or gravel; such a layer is a source of groundwater tapped when a well is dug.

the City acquired title to land 12 miles east of the City for use as a well site and made application to the DNR for permits for well construction pursuant to Minn.Stat. § 105.-41 (1978).

Six months after the City made its application, the Company and its sole owner, Ray G. Mair, filed partial applications with the DNR for permits to construct 12 wells for irrigation purposes on Company land lying adjacent to the City's proposed well sites. The wells proposed by the Company would tap the same water source which the City seeks to utilize. Hearings on two of these applications which had been substantially completed, those concerning Wells A and H, were consolidated over the objections of the City and the DNR with a hearing on the City's applications. The consolidated hearing was held on December 14–15, 1977, and January 23–25, 1978.

The City's water supply system serves domestic and commercial users. Water consumption records reveal that, for the years 1975, 1976, and 1977, approximately thirty percent of the City's water use over the course of a year was for commercial or industrial concerns, with the remaining seventy percent used domestically. During the months from May to August, however, when irrigation could be expected to take place, domestic use accounted for ninety percent of the City's consumption. The City seeks to construct four wells, two of which would tap the aquifer which is close to the surface, and two of which would tap the deeper aquifer, and desires to pump 700 gallons per minute in order to meet the present demand for 440 million gallons per year and a demand for 700 million gallons per year within 25 years.

As an alternative to use of groundwater, the City considered building a new surface (river) water treatment plant but determined that maintenance costs for such a plant would be considerably higher than for a groundwater plant and that groundwater would be of higher quality. The City's consulting engineer testified that a system which utilized both groundwater and surface water sources would be prohibitively costly and that the City had given no genuine consideration to a plan in which industrial water users were not provided with City water.

The City performed pumping tests using standard hydrologic procedures on its property in order to determine the characteristics of the upper or more shallow aquifer at its proposed well site. The tests were performed under the supervision of the City's hydrologist, Bruce Liesch, who had 28 years of experience working with the U.S. Geological Survey Water Resources Division, Ground Water Branch of the State of Washington, State of Minnesota Conservation Department, Division of Waters, and as a private consultant in groundwater hydrology engineering. With regard to the availability of water in the upper aquifer, Mr. Liesch concluded as follows:

> On the basis of the results of the testing program and other available geologic and hydrologic data, it appears that a system of properly designed and constructed wells in the water table aquifer would provide an adequate water supply for the City of Crookston if the presupposition is made that other large capacity wells are not constructed in the vicinity and protracted droughts do not occur. During a protracted drought, additional wells in the water table aquifer and possibly in the deep artesian aquifer would be required to utilize the large storage characteristics of the aquifers.

Mr. Liesch's expert opinions were based not only on the pumping tests but on personal field investigation, electrical resistivity testing, aquifer testing, and other hydrologic and geologic information.

The Company seeks permits for 12 wells to be used for irrigation purposes on 1,600 of the 10,200 acres it owns east of the City. The proposed wells would pump at a capacity of 800 gallons per minute. The land which the Company proposes to irrigate is currently leased for gravel mining. However, Ray Mair testified that for several years he had planned to reclaim the mined areas and that he had retained an irrigation expert to set up an irrigation program.

In order that City testing data could be used in analyzing the Company applications, the Company chose two of the 12 well sites, those proposed for Wells A and H, which are located closest to the City's test well, and substantially completed those applications. Hearings on those two applications were consolidated with the hearing on the City's well applications, but it was not clear that the DNR considered these two Company applications complete. Minn.Stat. § 105.416, subd. 2 (1978) requires that the Company's applications be accompanied by records of pumping tests and by "logs of test holes"–that is, records made when test holes are drilled to locate water. The statute further provides, however, that in any specific application, the Commissioner may "waive any of the requirements * * * when the necessary data is already available." *Id.* The Company has performed no independent drilling or testing at any of its proposed well sites. Sarah Tufford, an administrative hydrologist with the DNR, indicated that the two Company applications were not complete to the satisfaction of the DNR.

Experts called by the City, by the DNR, and by the Company were in substantial agreement that the groundwater supply is not adequate for both the City and the Company to pump water at the rates they propose. The Company's experts, two private consulting engineers, testified as to their doubt that the proposed water supply was adequate to meet the City's needs alone, apart from proposed uses by the Company. These experts had merely reviewed the reports and data collected by the City's expert hydrologist and did no independent field investigation. Their testimony that the groundwater supply might be insufficient for even the City's use alone was based on their belief that the available surface land area which could collect precipitation, some of which would eventually replenish the tapped aquifer (called the "recharge area"), was much smaller than would be necessary for adequate "recharge."

The Acting Commissioner of the Department of Natural Resources made independent fact findings and issued his order on September 7, 1978, granting the City of Crookston permission to develop two wells in the upper aquifer and to pump from each up to 700 gallons per minute to supply current needs and to develop one "exploratory" well into the deeper aquifer. He denied the Company's applications "until such time as Crookston Cattle Company can show no adverse impact on higher priority users." He ordered further that the City be responsible to assure domestic water supplies at "vicinity households" so that such domestic needs are met, this apparently in response to testimony introduced by the Town of Lake Pleasant which indicated that farmers on land up to several miles away from the pump site had experienced water shortages during the test pumping period.

The Company sought review of the Commissioner's order. The Ramsey County District Court affirmed, and petitioners appeal. In one of the major cases to come before the court, these issues are raised:

(1) Does the Commissioner's final order work an unconstitutional taking of private property without compensation?

(2) Does the Commissioner's final order violate Minnesota Water Appropriation Law, Minn.Stat. § 105.41 (1978), or Minnesota Environmental Policy Law, Minn.Stat. §§ 116D.04 and 105.405, subd. 1 (1978)?

(3) Is the Commissioner's final order arbitrary and capricious and unsupported by substantial evidence?

1. Current Minnesota water resources law provides for state control of use of "underground waters of the state":

105.38. DECLARATION OF POLICY. In order to conserve and utilize the water resources of the state in the best interests of the people of the state, and for the purpose of promoting the public health, safety and welfare, it is hereby declared to be the policy of the state:

(1) Subject to existing rights all public waters and wetlands are subject to the control of the state.

> (2) The state, to the extent provided by law from time to time, shall control the appropriation and use of surface and underground waters of the state.

Minn.Stat. § 105.38 (1979). The Company argues that, by granting the City's application for permits for the construction of two wells and denying the Company's application, the DNR has deprived the Company of its property rights to a reasonable use of the underground water without compensation. Citing a number of cases on which the Company relies, the district court concluded that "[t]he owner of land beneath which are percolating waters thereby has a property right in such waters and is entitled to their beneficial use as limited by the reasonable use rule." We have recognized that, under the riparian doctrine of water rights, any property owner whose property touches on water has a right to reasonable use of the water, his right to such reasonable use limiting the use of that water by other riparian owners. *Petraborg v. Zontelli*, 217 Minn. 536, 15 N.W.2d 174 (1944). We have also recognized, however, that riparian rights are subordinate to the rights of the public and are subject to state regulation. *State v. Kuluvar*, 266 Minn. 408, 418, 123 N.W.2d 699, 706 (1963); *Reeves v. Backus–Brooks Co.*, 83 Minn. 339, 86 N.W. 337 (1901). As the trial court noted, Minn.Stat. § 105.38(1) (1978) (amended 1979) declares that: "Subject to existing rights all waters of the state which serve a material beneficial public purpose are public waters subject to the control of the state." The state has exercised that control by enacting a water priority statute, Minn.Stat. § 105.41 (1978). That statute, which is a valid exercise of the state's police power, requires potential major water users to apply to the Commissioner of Natural Resources for a permit to appropriate water and identifies priorities for water use of limited water resources.[2]

Like zoning legislation, legislation which limits or regulates the right to use underlying water is permissible. In *McShane v. City of Faribault*, 292 N.W.2d 253 (Minn.1980), where plaintiff property owners argued that an airport approach zoning ordinance resulted in a "taking," we noted a distinction between interference with private property by regulation of property use, as through zoning, and interference by the government's physical intrusion. In the former category, we held that regulation which operated for the sole benefit of a governmental enterprise, a municipal airport, disproportionately burdened a few landowners, who were entitled to compensation. Where regulation operates to arbitrate between competing public and private land uses, however, as does the water priority statute in this case, such regulation is upheld even where the value of the property declines significantly as a result.

Plaintiffs here raise "taking" claims in the latter category, interference by physical governmental activity. The permit takes nothing, however. It is permissive only. Until it is clear that the City's water use, permitted by the DNR deprives the Company of water it needs, such a claim is premature.[3] No pumping or

---

2. Minnesota Statutes § 105.41 (1978) reads in pertinent part:

 Subd. 1a. The Commissioner shall submit to the legislature by January 1, 1975, for its approval, *proposed rules governing the allocation of waters among potential water users.* These rules shall be based on the following priorities for appropriation and use of water:

 First priority. Domestic water supply, *excluding industrial and commercial uses of municipal water supply.*

 Second priority. Any use of water that involves consumption of less than 10,000 gallons of water per day. For purposes of this section "consumption" shall mean water withdrawn from a supply which is lost for immediate further use in the area.

 Third priority. *Agricultural irrigation*, involving consumption in excess of 10,000 gallons per day, and processing of agricultural products.

 Fourth priority. Power production, involving consumption in excess of 10,000 gallons per day.

 Fifth priority. Other uses, involving consumption in excess of 10,000 gallons per day. (Emphasis supplied.)

3. Assuming that a property owner may have a property right to the reasonable use of percolating waters beneath his land, subject to reasonable use by others, where an adjoining land-

depletion of the groundwater supply has yet occurred, and any damages to be awarded are therefore speculative. The permit issued by the DNR to the City in this case provides that before doing anything which involves the "taking, using, or damaging of any property, rights or interests of any other person or persons," the City will have to obtain such owner's written consent "and shall acquire all property, rights and interests necessary therefor." This provision, as the trial court recognized, "adequately protects petitioner's property rights in water underlying their land in accordance with Article 1, Section 13 of the Minnesota Constitution." Furthermore, the Company's own permit applications have not been unconditionally denied. The Company is free to submit an application when it has available the data necessary to establish that its proposed use of the underground water source will have no adverse impact on higher priority users protected by the permitting statute.

We conclude, as did the trial court, that the Commissioner's order does not work an unconstitutional taking of private property without compensation.

2. Next, we must consider plaintiff's claims that the Commissioner's order violates Minnesota Water Appropriation Law, Minn.Stat. § 105.41 (1978), and Minnesota Environmental Policy Law, Minn.Stat. §§ 116D.04 and 105.405, subd. 1 (1978).

■ (a) *Section 105.401.* As noted above, Minn.Stat. § 105.41, subd. 1a, establishes certain priority levels for appropriation of surface and underground waters. Priority levels which are the subject of argument in this case are the first and third:

First priority. Domestic water supply, excluding industrial and commercial uses of municipal water supply.

\*  \*  \*  \*  \*  \*

Third priority. Agricultural irrigation, involving consumption in excess of 10,000 gallons per day, and processing of agricultural products.

The statute's first priority level codifies a common–law principle which grants a municipality paramount priority in the use of water for a public purpose. *See Mitchell v. City of St. Paul,* 225 Minn. 390, 31 N.W.2d 46 (1948); *Aspects of Water Resources Law in Minnesota,* 16 (University of Minnesota Water Resources Research Center, Bulletin 11, 1969). There seems little question that the City of Crookston is entitled to first priority in allocating possibly scarce water for providing water to Crookston homes.

However, evidence in this case indicated that the City of Crookston supplies certain commercial plants with water from the municipal water source and that these plants—Simplot, a processor of french fried potatoes; the American Crystal Sugar Company; and Coca–Cola Bottlers—account for thirty percent of the City's water consumption. Because the Department of Natural Resources has not yet promulgated standards for application of the priority levels,[4] it is not clear whether these consumers constitute "industrial and commercial users of municipal water supply," which properly must be excluded from the first priority level, or "processors of agricultural products," which fall into a priority level equal with that for the Company's proposed water use, agricultural irrigation. The Company argues that thirty percent of the City's proposed water consumption will be provided for consumers that, at best, rank only on an equal priority level with its own proposed use, and that granting the City's well permit application allows these users to "bootstrap" their water allocation into the "domestic user" category. The testimony of the City's consulting engineer indicated that the City had given no genuine consideration to an alternative water plan in

---

owner, such as the City here, removes water from its 160–acre tract and transports it 12 miles away, for public use, a taking may occur. The remedy for such a taking would be a proceeding against the City for inverse condemnation.

**4.** Section 105.41 requires that the DNR Commissioner develop rules for water allocation by January 1, 1975. Such rules were not prepared and are not available to date.

which these plants were not provided with municipal water, because he had "trouble separating industrial and commercial users from people."

In light of the fact that thirty percent of the City's water provides users whose priority levels are equal to or less than the Company's proposed use, we conclude that the Company's showing of "no adverse impact on higher priority users," required by the Commissioner's order, need only be a showing of no adverse impact on the domestic use of the city.

■ (b) *Sections 116D.04 and 105.405.* The Minnesota Legislature has established an environmental policy which requires that, in making permit decisions, the Commissioner consider long–range goals of conservation and preservation of natural resources. Minn.Stat. § 116D.04, subd. 6, (1978) provides:

> No state action significantly affecting the quality of the environment shall be allowed, nor shall any permit or natural resources management and development be granted, where such action or permit has caused or is likely to cause pollution, impairment, or destruction of the air, water, land or other natural resources located within the state, so long as there is a feasible and prudent alternative consistent with the reasonable requirements of the public health, safety, and welfare and the state's paramount concern for the protection of its air, water, land and other natural resources from pollution, impairment, or destruction. Economic considerations alone shall not justify such conduct.

Specifically in the area of water supply, Minn.Stat. § 105.405 (1978) makes the following requirement:

> WATER SUPPLY MANAGEMENT. Subdivision 1. The commissioner shall develop and manage water resources to assure a supply adequate to meet long range seasonal requirements for domestic, municipal, industrial, agricultural, fish and wildlife, recreational, power, navigation, and quality control purposes from surface or ground water sources, or from a combination of these.

The district court found that Minn.Stat. § 116D.04, subd. 6, was not applicable to this case because there was no showing that the City's proposed action would result in "pollution, impairment, or destruction" of water resources. There was evidence to support the City's contention that groundwater in the aquifer would be naturally replenished by precipitation. The Commissioner could justifiably conclude that a showing that alternatives had been considered was not required where the destruction of natural resources had not been established.

The Company argues that, in addition to his duty to prevent destruction of natural resources, the Commissioner is subject to a duty to manage water resources so as to assure an adequate supply to meet domestic, agricultural, and industrial purposes, among others, and that the Commissioner's order fails to meet that responsibility. The DNR responds that the statute does not mandate that the Commissioner provide water supplies for any purpose in every instance but that he manage the waters of the state in the best manner possible in the long term so as to make the best possible use statewide of the available resource. Using its agency expertise, the DNR has reviewed the future water management problems of the whole Crookston region and has made a policy judgment that the City's application for two of the wells requested to supply present City need, and one new well for testing in the lower aquifer, be granted. The domestic water supplies of the residents of the Town of Lake Pleasant and other vicinity households are assured by the conditions attached to the permit granted to the City. The permit may be terminated without notice at any time the Commissioner deems it necessary for the conservation of water resources, or in the interests of public health or welfare or for the violation of any of the provisions of the permit, including the required acquisition by the City of any property, rights, and interests of other persons which may be taken, used, or damaged. In light of these

provisions, and giving the agency judgment the weight to which it is entitled, *see Reserve Mining Co. v. Herbst*, 256 N.W.2d 808 (Minn.1977), we conclude that the DNR has met its burden under § 105.405, subd. 1, and uphold its decision.

3. Finally, we turn to petitioner's claim that the Commissioner's order is arbitrary and capricious and unsupported by substantial evidence. Agency decisions are presumed correct by the court, out of deference to agency skill and technical expertise, and will be reversed only when they reflect an error of law or when the findings are arbitrary and capricious or are unsupported by substantial evidence. *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 824, 827 (Minn.1977). We find the Commissioner's decision granting the City's permit application with conditions and denying the Company's application to be supported by substantial evidence and, for the reasons set out above, not arbitrary or capricious.

Affirmed.

YETKA, Justice (concurring in part and dissenting in part).

I concur in part and dissent in part. The Court is correct in denying the "taking" claim at this time because appellant has not yet shown any loss. The proper remedy lies in a proceeding for inverse condemnation.

I feel compelled, however, to address my concern that this Court has set a dangerous precedent by approving the agency's action to permit a municipality to convert from an adequate surface water supply to an underground water supply. The public, as well as the citizens of Crookston, should be made aware of the dangers inherent in undertaking this shift to a ground water source.

At the outset, I think it is important to note that this case involves some procedural peculiarities. The majority opinion cites findings by the Commissioner of the Department of Natural Resources supporting his conclusions that grant the city a permit to drill the underground wells and to construct the 12 miles of pipeline that will be required. However, the majority does not even mention the findings, conclusions and recommendations contained in the report of the state's own hearing examiner. The hearing examiner heard the evidence of all of the witnesses involved in these applications. For the sake of brevity, I do not intend to set out his findings, but his conclusions and recommendations are as follows:

## CONCLUSIONS

1. That insofar as any of the foregoing Findings of Fact are more properly denominated Conclusions, they are hereby adopted as such.

2. That the Department of Natural Resources duly acquired and now has jurisdiction over the within proceeding. It has complied with all relevant procedural requirements of statute and rule.

3. That both of the proposed uses will serve a beneficial public purpose.

4. That a valid carefully controlled pumping test is needed in the upper aquifer before the impact of the City's proposed use can be assessed.

5. That a full test of the lower aquifer is needed before the impact of the City's proposed use can be assessed.

6. That no permit should be issued until the full impact of the proposed use is assessed, including how many additional wells and well fields must be constructed and when.

7. That the City ignored fundamental recommendations of its expert witness in seeking to go ahead with this project without completing the necessary testing.

8. That the available evidence suggests that the City expert has overestimated the capacity of the upper aquifer.

9. That any permits for high capacity pumping that are issued in this area should have conditions to protect potentially adversely affected adjacent farm and residential wells.

10. That any permit issued for high capacity wells should contain conditions to ensure the statutory priority rights of all users.

11. That all permits issued for high capacity wells should contain notice of all readily ascertainable specific potential future limitations or other modifications likely as a result of future applications for competing uses.

12. That surface waters from the Red Lake River are adequate for the present and foreseeable future needs of municipal water supply for the City of Crookston.

13. That the overall long–term allocation of combined total ground and surface resources must be carefully considered in any major shift of use from one source to another, including all planned and potential beneficial uses of these resources.

14. That there is not an adequate supply of groundwater resources at the location herein for municipal, industrial and agricultural uses combined.

15. That granting the applications proposed for municipal and industrial purposes will make it impossible to assure an adequate supply for agricultural purposes in this area.

16. That requiring the City to continue to utilize surface water will assure that there is an adequate supply for all three purposes.

17. That granting the proposed City permit will affect a diversion of surface water resources of the state to a place outside of the state and to Canada for at least 20 years without a determination by the Commissioner that the water remaining in this part of the state will be adequate to meet the state's water resources needs over that 20–year period.

18. That granting the proposed City permit will involve a diversion of groundwaters of the state to a place outside of the state and to Canada for at least 20 years, without a determination of the Commissioner that the water remaining in this part of the state will be adequate to meet the state's water resources needs during that 20–year period.

19. That there is inadequate data available on groundwater resources in this part of the state to make a determination as to the adequacy of combined ground and surface water resources for the needs of the state over the next 20 years.

20. That granting the proposed City permit would not encourage appropriation and use of surface water from streams during periods of flood flows and high water levels.

21. That granting the proposed City permit would cause it to establish a groundwater system that would add substantial amounts of groundwater to streams during periods of flood flows and high water levels.

22. Granting the proposed permit would effectively preclude future appropriation and use of surface water from the Red Lake River during periods of flood flows and high water levels, by the largest existing appropriator and user in the watershed.

23. That if a determination could be made as to the adequacy of available remaining state water resources, granting of the proposed permits would not be an action discouraging the diversion of water from the state for use in other states and Canada.

24. That continuing to use a surface water source, supplemented with groundwater is an alternative to granting the proposed permits that has not been studied, developed and described.

25. That a more diverse groundwater system utilizing more wells in different aquifers and lower capacity pumping is an alternative which has not been studied, developed and described.

26. That utilizing a separate industrial water supply system is an alternative that has not been studied, developed and described.

27. That issuance of the permit will cause impairment and destruction of groundwater and land resources located within the state.

28. That continued use of surface water supplies from the Red Lake River for municipal purposes by the City is a feasible and prudent alternative consistent with the reasonable requirements of public health, safety and welfare and the state's para-

mount concern for the protection of its water and land resources from impairment and destruction. Economic considerations are the sole valid reason that has been advanced for not utilizing this alternative.

29. That from the limited information available, except for economic considerations, it appears that upgrading or replacing the existing surface water treatment plant and supplementing it with groundwater would be a feasible and prudent alternative consistent with the reasonable requirements of the public health, safety and welfare and the state's paramount concern for the protection of its water and land resources from impairment or destruction.

30. That from the information that is available, except for economic considerations, it appears that a more diverse system utilizing additional wells in other aquifers and lower capacity pumping would be a feasible and prudent alternative consistent with reasonable requirements of public health, safety and welfare and the state's paramount concern for the protection of its water and land resources from impairment or destruction.

31. That the proposal of Department Staff in their proposed findings for a one and one–half mile protective zone around the City well field, prohibiting irrigation wells, would directly violate the statute giving irrigation uses equal priority to the agricultural–industrial use, to which roughly 30 percent of the municipal water is put.

32. That neither the need for nor the reasonableness of the granting of permits to the City has been documented by an affirmative presentation of facts.

33. That these Findings, Conclusions and Recommendations are made explicitly without weighing other considerations peculiar to DNR knowledge and expertise. For this reason, the statute leaves action or inaction with regard to the Recommendations to the Department. Priorities in the application of limited DNR resources to the protection of the state's natural resources is properly evaluated and understood only by the Department. This is why the Legislature left such decisions to the Department.

## RECOMMENDATIONS

IT IS HEREBY RECOMMENDED: That on the basis of the full record herein, the Department reverse its earlier recommendation to the City to switch to a groundwater system. Such a reversal (or even official neutrality), together with the delay involved in further testing and likely litigation, would probably cause the City to return to its initial plans to construct a new surface water treatment plant.

IT IS FURTHER RECOMMENDED: That the Department require a carefully controlled valid pumping test in the upper portion of the aquifer and thorough testing of the lower portion of the aquifer with provisions to prevent the discharges from the pump from recharging the aquifer before granting any permits. Perhaps with the agreement of the City, the cost of this testing could be spread more equitably by requiring that the Cattle Company bear the costs of tests in either the upper or lower portion of the aquifer as a condition precedent to the granting of one of its irrigation permits. If the parties are still in disagreement after the investigation is complete, a further hearing should be conducted to consider the test data and the information that has been developed on the proposed alternatives.

IT IS FURTHER RECOMMENDED: That if the preceding Recommendations are not followed, any permit issued to the City should explicitly indicate that in the event of verified interference with adjacent high capacity irrigation wells, the allowable appropriation at this site will be cut back rateably [sic] to assure that irrigation uses retain their equal priority with agricultural–industrial uses. Any permits issued for irrigation should contain a similar condition to protect the statutory priority accorded the City's domestic users.

IT IS FURTHER RECOMMENDED: That the Department process the two Cattle Company applications. Final action on their permits should also be delayed until after completion of the hereinabove recommended further testing.

IT IS FURTHER RECOMMENDED: That all applications herein be denied until such time as the applicants agree to some informal, inexpensive procedure to ensure that domestic users are adequately compensated for the expenses of installing, deepening or otherwise improving wells to retain their statutory priority.

Dated: July 19, 1978.

/s/ Howard L. Kaibel
Howard L. Kaibel, Jr.
Hearing Examiner

In spite of these specific recommendations that were solidly grounded on the evidence, the commissioner, presumably relying on his own inner office experts, refused to adopt those recommendations and instead issued his own findings and conclusions that were contrary to those of the hearing examiner. These proceedings suggest that too much emphasis was put on the opinions of the agency's experts. The opinions of those with special knowledge must always be considered but not to the exclusion of other relevant and important evidence. Similarly, the application of logic, common sense and public policy considerations cannot be wholly abandoned in favor of technological expertise. An analysis of some of the contentions made by the city in this case using those factors suggests to me the following:

There are a number of justifications for the city's conversion to a ground water supply that have been asserted in this case. These justifications include the claim that the present surface water supply, the Red Lake River, is unreliable because it is controlled by the Red Lake Indians. There is no adequate support in the record for the bold assertion that the Red Lake Indians might cut the flow of water in the river. It is doubtful whether a tribal council would take such action even if it had the authority to do so, and if the Indian authorities did have such authority, can one seriously doubt the quick response on the part of both the state and the Congress of the United States to rectify such an action?

It is also alleged that the surface runoff and farm fertilizer does and will continue to pollute the Red Lake River. If it can be assumed that such pollution is occurring, is the appropriate response action which merely avoids the problem by looking to another source of water? I think not. The better answer is to control pollution at its source. Many of the nation's rivers, streams and waterways are being revitalized as a result of local community concern about pollution. Salmon are back in many of our nation's river systems along the oceans; trout are back in the Hudson; walleyes are back in the St. Louis River in our own state; and Lakes Erie and Ontario are once again being opened to swimming. It would appear to me to be more productive to halt the pollution of Red Lake River than to ignore the problem by converting to a ground water supply. What course is left to the city in the event that the ground water source becomes polluted? There will come a time when the alternative sources of water have been exhausted and pollution will have to be confronted. To delay that confrontation is not in the public interest.

The final justification for conversion to ground water is economics. The contention that the tapping of an underground water source is less expensive than constructing new treatment facilities and controlling pollution ignores some very real potential difficulties. If the underground water source becomes polluted, purification facilities will have to be built. If the quantity from the underground source is insufficient, the city must again look to the river for water and a treatment plant would be necessary at a cost substantially greater than the initial investment in the ground water supply system. If a dual supply system is used, the expense would be significantly greater than the cost of upgrading the supply system from the river alone.

Additionally, the ground water source chosen as an alternative supply by the city is not without problems. A recent article in a leading monthly magazine points out that in some areas of the nation, particularly in California where heavy underground water use has been the vogue for the past 30 years, the land surface itself is beginning to

cave in and sink, in some cases up to 20 and 30 feet, and wells have been made ever and ever deeper to reach water.[1] Another article in a weekly news magazine points out that once underground water is polluted by fertilizer or chemicals, it is much more difficult to purify than surface water.[2]

The questions raised by the above discussion have not been adequately dealt with by the city, the DNR or this Court. Until these questions can be properly answered, prudence dictates delay and caution in proceeding to use sources of underground water when adequate supplies of surface water are available.

This Court should not reverse an administrative agency for the sole reason it believes an agency decision is unwise. It is my opinion, however, that not only is the decision by the DNR in this case unwise, but that it also sets very bad precedent. Moreover, I submit the agency's decision does not adequately protect the rights of private property owners—rights still very basic to our system of government—nor does the decision protect the citizens of the City of Crookston or the citizens of the State of Minnesota from a possible future environmental and economic catastrophe.

I would find that the decision of the agency does not have adequate support in the record. Accordingly, I would reverse the granting of the permit to the City of Crookston and remand the case to the DNR with instructions to order additional public hearings following the submission of those additional tests and water data recommended by the original hearing examiner.

PETERSON, J., took no part in the consideration or decision of this case.

---

1. *See* Canby, *Our Most Precious Resource: Water,* 158 Nat'l Geographic 144, 170 (1980).

2. *See The Poisoning of America,* Time, Sept. 22, 1980, at 58, 66.