**In the Matter of AMENDMENT NO. 4 TO AIR EMISSION FACILITY PERMIT NO. 202I–85–OT–1 for the Northern States Power Company Wimarth Generating Plant in Mankato, Blue Earth County, Minnesota.**

No. C0–89–1127.

Court of Appeals of Minnesota.

Jan. 23, 1990.

Carla C. Kjellberg, St. Louis Park, for Relator.

Hubert H. Humphrey, III and Ann M. Seha, Sp. Asst. Atty. Gen., St. Paul, JoAnn

M. McGuire, and Joseph D. Bizzano, Jr., Minneapolis, for intervenor-respondent.

Heard, considered and decided by WOZNIAK, P.J., and PARKER and CRIPPEN, JJ.

## OPINION

CRIPPEN, Judge.

Earth Protector, an environmental organization, asks this court to correct a Minnesota Pollution Control Agency decision to deny a contested case hearing concerning the agency's issuance of a permit modification for Northern States Power's garbage-burning power station in Mankato.

## FACTS

NSP's Mankato electricity generating station, further identified as the Wilmarth plant, began operating in 1947. In 1985, MPCA issued a five-year permit allowing Wilmarth to operate with refuse-derived fuel. Since that time, the station has generated electricity by burning garbage from the Twin Cities area. The plant was permitted to burn 850 tons of refuse per day. Pollution control was to be achieved through the use of equipment identified as an electrostatic precipitator. Although relator requested a contested case hearing concerning the 1985 decision to issue this permit with this control technology, the hearing was not granted.

In July 1988, MPCA conducted tests of the plant's emissions. These tests showed the emissions violated the "opacity"[1] limits contained in the original permit. The MPCA pronounced itself satisfied that no other Clean Air Act violations had occurred.[2]

These test results prompted MPCA to issue a notice of violation in November 1988, requiring NSP to reduce the station's output by one-half, to propose new pollu-

tion control equipment, to explain the circumstances surrounding the violation, and to explain the steps it was taking to correct the problem. The findings also precipitated a petition signed by 2234 Mankato citizens, asking that the station be shut down immediately.

The present controversy was initiated by NSP's February 1989 filing of a formal request for an amendment to its operating permit to allow installation of new pollution control equipment. The MPCA responded by issuing a draft permit in March 1989. A comment period followed during which fifty-three people submitted 24 reports and letters. Also during this time, Mankato citizens expressed concern over the progress of a health risk assessment. Although the desire to conduct this assessment before issuing the permit was discussed in Air Quality Committee meetings and is mentioned in the findings, it apparently was never completed. Relator filed its request for a contested case hearing under Minn.R. 7001.0130 (1989) on March 19, 1989.

The comments, hearing request, and other information were presented to the MPCA Board at its May 1989 meeting. The citizens group renewed its request for a shutdown of the station, and relator was allowed to make a brief presentation. The Board unanimously denied relator's hearing request, rejected the demand to close the plant, granted the permit amendment, and adopted written findings in support of its decisions.

Relator challenges MPCA's approach to this permit on several related fronts: Although MPCA is still engaged in developing an overall set of rules, it has permitted 13 such stations since 1982; these permits include discrepant requirements as to equipment and emission levels; equipment which was previously deemed ineffective at

---

**1.** Opacity is defined by Minn.R. 7005.0100, subpt. 29 (1989) as "the degree to which emissions reduce the transmission of light and obscure the view of an object in the background."

**2.** While subsequent findings call lead emissions "far below any level of concern," MPCA staff member Lisa Thorvig spoke of high lead emis-

sions at MPCA Air Quality Committee meetings on December 19, 1988 and February 27, 1989. Also, the record indicates that Mankato lead emissions are five to ten times the level permitted the new Hennepin County garbage-burning station.

Mankato is now deemed effective, again without a contested case hearing; and emission dangers thought to be controlled at other plants have reoccurred. In sum, relator points to inadequacies in the process, claiming that MPCA's decision will permit new equipment which allows dangerous pollution, and that it was error to do this without holding a contested case hearing to determine the equipment's effectiveness at controlling emissions. Relator presented eight fact issues to the MPCA that it believed needed attention in a contested case hearing. These issues can, in our judgment, be consolidated into four:

1. The adequacy of control equipment for hydrogen chloride;
2. The adequacy of control equipment for particulates and various chemicals other than hydrogen chloride;
3. The sufficiency of proposed emission testing for new equipment; and
4. MPCA's decision to proceed without knowing emission dispersion patterns in the area of the station and without fully acknowledging the existence of emission dangers.

## ISSUE

Under Minnesota Pollution Control Agency rules and related law, will a contested case hearing aid the agency in deciding whether to issue a permit modification on the Mankato generating station?

## ANALYSIS

This appeal is governed by the Administrative Procedure Act. Minn.Stat. § 115.05, subd. 11 (1988). Part of that Act provides that agency decisions may be reversed if they are "arbitrary or capricious." Minn.Stat. § 14.69(f) (1988); *see also Crookston Cattle Co. v. Minnesota Department of Natural Resources*, 300 N.W.2d 769, 777 (Minn.1980). Although agency decisions are presumed to be correct, *id.*, the "arbitrary or capricious" standard does not eliminate judicial scrutiny:

> [W]here there is a combination of danger signals which suggest the agency has

not taken a 'hard look' at the salient problems and 'has not genuinely engaged in reasoned decision-making' it is the duty of the court to intervene.

*Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 825 (Minn.1977) (quoting *Greater Boston Television Corp. v. Federal Communications Comm'n*, 444 F.2d 841, 851 (D.C. Cir.1970), *cert. denied* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971)).

Minn.R. 7001.0130, subpt. 1 (1989) contains the standard for holding a contested case hearing.[3] The agency must find:

A. that a person requesting the contested case hearing has raised a material issue of fact or of the application of facts to law related to the commissioner's preliminary determination or the terms of the draft permit;

B. that the agency has jurisdiction to make determinations on the issues of fact or of the application of facts to law raised by the person requesting the contested case hearing; and

C. that there is a reasonable basis underlying issues of fact or law raised by the person that requests the contested case hearing such that the holding of a contested case hearing would aid the agency in making a final determination on the permit application.

MPCA conceded that the questions which relator raised met criteria on material issues and agency jurisdiction. Thus, we focus on MPCA's determinations, repeated with respect to each issue, that a hearing would not aid it in making its final determination.

 The circumstances here demonstrate that a contested case hearing will aid the agency.

In *In Re Solid Waste Permit for the NSP Red Wing Ash Disposal Facility*, 421 N.W.2d 398 (Minn.Ct.App.1988), *pet. for rev. denied* (Minn. May 18, 1988), we discussed the aid-to-decision criterion and declined to require a contested case hearing. In *Red Wing*, "no hard data" existed on a material fact issue and the requesters failed to show they possessed information

---

3. "Contested case hearing" is defined in Minn. Stat § 14.02, subd. 3 (1988).

on the subject. *Id.* at 403. Respondents argue that *Red Wing* supports the decision to act without a hearing regarding all issues presented by relator. They contend a permit may issue without a contested case hearing in spite of a variety of questions, if the requester cannot produce evidence to support its position on the questions. Indeed, relator has not made a presentation of evidence that, by itself, would prompt a contested case hearing. However, *Red Wing* determines that a hearing will not aid the agency in the dual circumstances where (1) no evidence is yet available on a question and (2) none is presented by the requesting party. In the particular circumstances of this case, reviewed below, where evidence does exist on material questions raised, "there is a reasonable basis underlying issues" such that "a contested case hearing would aid the agency" in its final permit decision. Minn.R. 7001.0130, subpt. 1(c).

Also, Minnesota law prohibits taking any "state action" with significant environmental effects when feasible and prudent alternative mechanisms exist to avoid the likelihood of pollution. Minn.Stat. § 116D.04, subd. 6 (1988); *see also In Re Winona County Municipal Solid Waste Incinerator*, 442 N.W.2d 344, 348–49 (Minn.Ct.App. 1989), *rev'd sub nom. City of Winona v. Minnesota Pollution Control Agency*, 449 N.W.2d 441 (Minn. Jan. 5, 1990) (contested case hearing prematurely ordered). It is not questioned that the MPCA is engaged here in evaluating reasonable and prudent permit conditions that would serve as an alternative to permitting operations likely to cause air pollution. In the absence of supported findings that beneficial alternatives are infeasible or imprudent, the hearing process is a helpful forum for weighing such alternatives.[4]

In addition, the need to consider evidence on alternatives is consistent with the standard that the agency may not issue a permit without a "hard look" at the vital questions. *See Herbst*, 256 N.W.2d at 825.

Finally, the prospect for benefits from the hearing process is more evident where the agency's findings are not substantiated by the record. In several instances here, MPCA made conclusory findings which are not supported by critical factual findings or which conflict with other findings. To require the agency to state supporting facts and make noncontradictory findings is consistent with the standard that agency actions cannot be arbitrary or capricious. *See Reserve Mining Co. v. Minnesota Pollution Control Agency*, 364 N.W.2d 411, 414 (Minn.Ct.App.1985) (need to include written findings which support agency determination).

Here, a contested case hearing is necessary to aid the agency in dealing with the questions and alternatives which relator presented. We agree with relator that the need for a contested case hearing is increased by the absence of governing rules; the inadequacy of the 1985 permit requirements, determined without a hearing; and the summary process the agency employed in public review of the issues of this case.

It remains, then, to review with more particularity the MPCA determinations to deny the benefit of a hearing, regarding each of four issues it agrees are material.

### 1. Adequacy of Control of Hydrogen Chloride and Other Acid Gasses.

The amended permit states limits on hydrogen chloride gas emissions, but permits continued operations. NSP is required to submit a plan to meet the limit and to implement the plan within one year of submission. Relator argues it is meaningless to proceed without specifying this plan and a particular control method.

The agency based its decision here on Finding 26, which states that several options exist for achieving the required level of acid gas control and that none is the "best." Although the order indicates that evidence does exist on the adequacy of different control equipment, it cites no evidence supporting the conclusion that there

---

**4.** *Cf. Herbst*, 256 N.W.2d at 829 (no need to consider alternatives when safety of a proposed structure undisputed). In *Winona*, this court

held MPCA's finding that a garbage incinerator would not cause pollution was arbitrary and capricious. *Winona*, 442 N.W.2d at 349.

is no optimum method of control. Likewise, Finding 38 states that the variety of systems in use shows the absence of "general agreement" on optimal control methods, but the finding utilizes none of the available evidence on the adequacy of particular controls. In addition, failing to choose among several technology options conflicts with the statement in Finding 38 which identifies "spray dryer fabric filter technology" with "state-of-the-art-control". Findings on the permit amendment suggest that the agency has not taken a sufficient look at the alternatives.

In this connection, it is significant that MPCA, in Findings 57 through 61, did review available evidence and did consider alternatives in justifying the emission limit on hydrogen chloride after NSP questioned the need for such a limit. The significance of the agency's apparent failure to consider alternative control methods is also increased by its stated goal that hydrogen chloride control should be achieved through the use of state of the art equipment.

We conclude that a contested case hearing would aid the agency in identifying the available options for control of acid gasses, evaluating their adequacy, and considering which are most feasible and effective.

### 2. Control of Particulates and Chemicals Other Than Hydrogen Chloride.

The tests in 1988 revealed that lead was a major component of plant emissions. The amendment sets limits on emission of particulates and dioxin/furan compounds, and the only specified form of control is the fabric filter.

#### a. Choice of fabric filter.

Relator contends that a fabric filter is not the most appropriate form of control technology for this facility, and argues that this issue takes on added importance in light of the agency's 1985 determination that these filters are less effective than electrostatic precipitators, which also now have proven to be inadequate. In Finding 23, the agency states that fabric filters are adequate to control particulates and cites appropriate supporting evidence. How-

ever, the findings do not address the value of the filter in comparison to alternative controls. Moreover, given the fact that the earlier determination was made without benefit of a contested hearing, a hearing now would aid the agency in attaining its stated goal of requiring state of the art equipment.

#### b. Adequacy of fabric filter.

Relator further contends that a fabric filter will inadequately control emissions of lead, arsenic, cadmium, dioxin/furan, mercury, and hydrogen chloride. MPCA acknowledges that fabric filters are not designed to limit gaseous emissions. However, MPCA found that lead, arsenic and cadmium are "primarily" eliminated by the fabric filter and that dioxin/furan compounds, which exhibit the tendency to attach to particulates, will be filtered by more than fifty percent. These findings on lead and dioxin/furan control only slightly address the fact issue, and are made without revealing the evidence supporting the conclusions.

Finding 31, which concerns mercury control, is of special concern. It acknowledges that mercury emissions will be only "partially" controlled by the fabric filter and cites evidence that mercury which has chemically combined with chlorine will be effectively removed. However, the finding also states that this type of removal is dependent upon the mercury being in particulate form, which, according to the finding, does not happen at Mankato. Thus, there is no showing of how this evidence relates to the Mankato station. The unsupported and self-contradictory nature of these findings indicate that MPCA has not taken a hard look at the questions.

MPCA also found, in Findings 32 and 42, that emission testing on lead, mercury, cadmium and arsenic show levels which are not outside the safety range. While these findings are supported, they too exhibit disturbing inconsistencies. Finding 42 also indicates that lead emissions are "relatively high," and it expresses the need to conduct ambient air monitoring tests for all these metals. Also, Finding 43 discusses the

need to complete a health risk assessment for the Mankato community. The inconsistent findings indicate that the agency has not taken an adequate look at achieving controls consistent with the overall goal of state of the art design.

c. Necessity of multiple pollution control devices.

Relator contends that multiple electrostatic precipitators combined with wet scrubbers would be superior devices to control mercury and acid gasses. It further argues that these devices, together with dry lime injections, are needed with the fabric filter. The agency found that alternate control systems are only equally effective, that there is no general agreement on an optimal systems, and that complex systems are less reliable and more costly. No evidence is shown regarding the reliability and cost of complex systems, though the findings suggest evidence is available. Regarding the finding on the equality of complex systems, MPCA cites evidence of pollution control achieved in other countries without stating how it applies to the Mankato situation. We note also that this permit amendment contemplates the eventual installation of a combination system. Nothing in the findings suggests that the agency took a hard look at any of the alternatives suggested by relator, separately or in combination.

We conclude that holding a contested case hearing would benefit the agency in determining the most effective state of the art system to control particulates, metals, and gasses other than hydrogen chloride. Particular attention will be needed on the comparative advantage of using other devices to control mercury and gasses.

3. Sufficiency of Proposed Emissions Testing.

Relator contends that MPCA is proceeding with this permit amendment even though required testing of stack emissions will not identify all pollutants. The required testing will be minimal: NSP must test for particulates, metals and dioxin/furan, and the amendment provides that testing for other chemicals may be conducted later. The agency also found that testing

for every possible pollutant is unreasonable. Although the finding that testing for all pollutants would be unreasonable is not arbitrary, there is no particular consideration given to testing for any additional chemicals. In addition, MPCA's reasoning on this question appears arbitrarily circular. The finding states, "MPCA believes that the test scope required in the permit amendment is consistent with permit requirements." As relator points out, if the permit requirements are insufficient, then the tests are insufficient. We believe that the failure to consider alternatives, together with the inadequate rationale for limited testing, justifies the need for a contested case hearing to explore the scope of testing.

4. Sufficiency of Knowledge of Dispersion Patterns and Emission Dangers.

Finally, relator argues that MPCA is proceeding without knowing the dispersion danger, while minimizing the general dangers of emissions. This question contains three subparts.

a. Dispersion danger.

Relator contends that MPCA, by its own admission, must conduct meteorological research to determine dispersion patterns before proceeding with the permit. MPCA listed this question as an item for further research. Findings 48 and 49 indicate that it would be possible to assume maximum dispersion at certain distances and suggest MPCA analyzes impact evidence conservatively. While MPCA identified assumptions that could be made, its findings do not indicate they were employed here or whether these assumptions are such that the dispersion which currently is assumed to occur will likely coincide with meteorological data to be collected later. Concern about dispersion takes on added importance in light of evidence in the record that dispersion patterns in the Mankato area are especially complex. Thus, the findings do not reflect an adequate look at the need for immediately obtaining the needed data.

b. Dioxin/furan dangers.

Relator contends that MPCA is proceeding while minimizing potential dangers

from dioxin/furan emissions. MPCA cited tests finding no correlation between levels of dioxin/furan found in people and the degree of solid waste incineration, and indicated the need for further research into the question. Under the *Red Wing* analysis, there is no error here. Relator has not shown that it could develop evidence within the confines of a contested case hearing that would aid MPCA in setting dioxin/furan limits.

c. Metals emission dangers.

Relator contends that MPCA minimizes the danger of heavy metals emissions, including lead, mercury, arsenic, and cadmium. Finding 53 states that, as yet, there has been no relevant Clean Air Act violation. The findings also state that, because of prior lead emission, more air testing is necessary. Relator has not questioned the decision to allow NSP to conduct further testing, and *Red Wing* underscores the propriety of issuing a permit while continuing to gather information.

In sum, there is no indication that MPCA has minimized the dispersion dangers such that its posture needs separate consideration in a contested case hearing. However, the hearing will aid the agency to determine the merit in proceeding while awaiting future meteorological testing.

### DECISION

The record discloses numerous instances where MPCA made its decision without taking a hard look at the issue as required by law. The agency failed to adequately consider alternatives, failed to address evidence supporting its findings, and made findings in apparent contradiction to cited evidence. In these instances, relator has shown that evidence on specific issues does exist and that a contested case hearing will aid the agency in its final determination.

Reversed and remanded.